No. 15-8109

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

WILDEARTH GUARDIANS, *et al.,*

Petitioners-Appellants,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, *et al.,*

Respondents-Appellees,

and

STATE OF WYOMING and WYOMING MINING ASSOCIATION, *et al.,*

Respondents-Intervenors-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING IN CASE No. 2:13-cv-00042-ABJ
(HON. ALAN B. JOHNSON)

---

## RESPONSE BRIEF FOR APPELLEE STATE OF WYOMING

---

Erik E. Petersen
Michael J. McGrady
Wyoming Office of the Attorney General
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-6946 phone
(307) 777-3542 fax
erik.petersen@wyo.gov
mike.mcgrady@wyo.gov
*Counsel for State of Wyoming*

**Oral Argument Requested**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

GLOSSARY......................................................................................... viii

STATEMENT OF RELATED CASES ....................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF ISSUES ......................................................................3

STATEMENT OF THE CASE..................................................................4

I.      Introduction.................................................................................4

II.     The National Environmental Policy Act ....................................4

III.    The Federal Coal Leases at Issue...............................................6

IV.     NEPA Compliance and Public Participation ..............................8

        A. The Environmental Impact Statement ...................................8

        B. Climate Change Considerations .............................................9

        C. The Records of Decision .....................................................10

        D. Comments on the Draft and Final EIS by the Interest Groups ...............11

V.      The Litigation Underlying this Appeal......................................13

VI.     The Broader Context..................................................................14

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT ..........................................................................................16

I.      Standard of Review...................................................................16

II.   The Bureau properly considered the climate change impacts
      of the No Action Alternative ..........................................................................18

      A. The Bureau's determination that the climate change impacts
         from the "preferred alternative" and the "no action alternative"
         were essentially equivalent was reasonable and supported by
         the record ..........................................................................................18

      B. The ruling in *Mid States* is distinguishable from the facts in
         this case, and the ruling should not guide this Court's analysis
         as a result ..........................................................................................21

      C. The Bureau was not required to conduct modeling of the
         potential market impacts from adopting the "no action" alternative,
         and the Interest Groups waived the right to raise this argument..............25

CONCLUSION ..........................................................................................29

STATEMENT ON ORAL ARGUMENT................................................................29

CERTIFICATE OF COMPLIANCE ......................................................................31

CERTIFICATES OF SERVICE, DIGITAL SUBMISSIONS AND
PRIVACY REDACTIONS ................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ........................................................................ 27-28

*Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
431 F.3d 1096 (8th Cir. 2005) ......................................................................... 23-24

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983) .............................................................................................. 16

*Colo. Envtl. Coal. v. Dombeck*,
185 F.3d 1162 (10th Cir. 1999) ......................................................................... 26

*Gilmore v. Weatherford*,
694 F.3d 1160 (10th Cir. 2012) ......................................................................... 27

*Hicks v. Gates Rubber Co.*,
928 F.2d 966 (10th Cir. 1991) .......................................................................... 28

*High Country Conservation Advocates v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ................................................................. 21

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ......................................................................... 17

*Intercargo Ins. Co. v. United States*,
83 F.3d 391 (Fed. Cir. 1996) ............................................................................. 26

*Koretoff v. Vilsack*,
707 F.3d 394 (D.C. Cir. 2013) ........................................................................... 27

*Lyons v. Jefferson Bank & Trust*,
994 F.2d 716 (10th Cir. 1993) .......................................................................... 28

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
345 F.3d 520 (8th Cir. 2003) ........................................................................... 21-25

iv

*Morris v. U.S. Nuclear Regulatory Comm'n,*
598 F.3d 677 (10th Cir. 2010) ...................................................................17

*N.M. ex rel. Richardson v. BLM,*
565 F.3d 683 (10th Cir. 2009) ............................................................ 19-21

*Nuclear Energy Inst., Inc. v. EPA,*
373 F.3d 1251 (D.C. Cir. 2004) ...............................................................27

*Olenhouse v. Commodity Credit Corp.,*
42 F.3d 1560 (10th Cir. 1994) ..................................................................17

*Powder River Basin Res. Council,*
180 IBLA 119 (2010) ...............................................................................15

*Powder River Basin Res. Council,*
183 IBLA 83 (2012) ..................................................................................15

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989) ...................................................................................5

*Sierra Club v. Clinton,*
746 F. Supp. 2d 1025 (D. Minn. 2010) .............................................. 23-25

*United States v. L.A. Tucker Truck Lines, Inc.,*
344 U.S. 33 (1952) ...................................................................................27

*Utah Envtl. Congress v. Bosworth,*
443 F.3d 732 (10th Cir. 2006) ..................................................................17

*Utahns for Better Transp. v. U.S. Dep't of Transp.,*
305 F.3d 1152 (10th Cir. 2003) ................................................................17

*W. Watersheds Project v. BLM,*
721 F.3d 1264 (10th Cir. 2013) .......................................................... 16-17

*WildEarth Guardians*,
183 IBLA 165 (2013) ................................................................. 15

*WildEarth Guardians v. BLM*,
8 F. Supp. 3d 17 (D.D.C. 2014) .................................................. 14

*WildEarth Guardians v. U.S. Forest Serv.*,
828 F. Supp. 2d 1223 (D. Colo. 2011) ....................................... 15

*WildEarth Guardians v. Jewell*,
 738 F.3d 298 (D.C. Cir. 2013) .................................................. 14

*WildEarth Guardians v. Salazar*,
783 F. Supp. 2d 61 (D.D.C. 2011) ............................................. 14

*WildEarth Guardians v. Salazar*,
880 F. Supp. 2d 77 (D.D.C. 2012) ............................................. 14

*WildEarth Guardians v. U.S. Forest Serv.*,
 120 F. Supp. 3d 1237 (D. Wyo. 2015) ................................... 2, 13

*Wyoming v. U.S. Dep't of Agric.*,
661 F.3d 1209 (10th Cir. 2011) .......................................... 6, 25-26

## STATUTES

28 U.S.C. § 1291 ........................................................................ 2

28 U.S.C. § 1331 ........................................................................ 2

42 U.S.C. §§ 4321-4370 ........................................................ 2, 4

42 U.S.C. § 4332(C) .................................................................. 5

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 1500.1(b) ................................................................ 6

40 C.F.R. § 1502.1 .................................................................... 5

40 C.F.R. § 1508.7 ............................................................................5

40 C.F.R. § 1508.11 ..........................................................................5

40 C.F.R. § 1508.25(c) ......................................................................5

**OTHER AUTHORITIES**

WildEarth Guardians, *The Powder River Basin – A Root Contributor to Global Warming*, available at http://tinyurl.com/m6wb3nj (last visited Mar. 31, 2016) ....14

# GLOSSARY

Bureau         United States Department of the Interior's Bureau of Land
               Management

$CO_2$          Carbon Dioxide

EIS            Environmental Impact Statement

NEPA           National Environmental Policy Act

PRB            Powder River Basin

ROD            Record of Decision

## STATEMENT OF RELATED CASES

In accordance with Tenth Circuit Rule 28.2(C)(1), the State of Wyoming represents that there are no pending cases related to this appeal.

## STATEMENT OF JURISDICTION

The district court possessed jurisdiction over this case pursuant to 28 U.S.C. § 1331 because three plaintiff groups challenged decisions made by the Bureau of Land Management (Bureau) under a number of federal statutes, including the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4370. The District Court rejected all claims advanced by the plaintiffs. *WildEarth Guardians v. U.S. Forest Serv.*, 120 F. Supp. 3d 1237 (D. Wyo.  2015). WildEarth Guardians and the Sierra Club (collectively, the Interest Groups) now appeal one narrow aspect of the District Court's decision. This Court's jurisdiction arises from 28 U.S.C. § 1291 as a result.

## STATEMENT OF ISSUES

NEPA requires agencies to consider the reasonably foreseeable impacts of proposed major federal actions. Here, the Bureau considered the reasonably foreseeable impacts related to the approval or denial of the continued operation of two coal mines located in Wyoming's Powder River Basin. In particular, the Bureau determined that the climate change impacts would be the same in either scenario, because electric generators could obtain replacement coal from other sources. Was this decision arbitrary and capricious?

## STATEMENT OF THE CASE

### I.    Introduction

The Interest Groups contend that the Bureau acted in an arbitrary and capricious manner when the agency analyzed the potential climate change impacts of the agency's decision to hold a competitive lease sale for four tracts of coal-bearing land in Wyoming's Powder River Basin (PRB). Specifically, the Interest Groups allege that the Bureau failed to adequately consider the market effect that would result from not leasing the tracts in question. The Interest Groups assert that not leasing the tracts would drive up the price of coal, which would then decrease demand for coal, thereby reducing the overall amount of $CO_2$ emitted by coal-fired power plants.

The Interest Groups are mistaken. The Bureau properly determined that, because replacement coal is readily available to the owner-operators of coal-fired power plants, the Bureau's decision would not have a meaningful impact on the overall market for coal. As a result, coal-fired power plants would emit essentially the same amount of $CO_2$ regardless of the Bureau's decision.

### II.    The National Environmental Policy Act

NEPA establishes a process that federal agencies use to consider the environmental consequences of their actions. *See* 42 U.S.C. §§ 4321-4370h. NEPA requires federal agencies to prepare a detailed "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(C). An EIS must include a "detailed [written] statement" concerning "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided." *Id.* An EIS should inform the decision-maker and the public of reasonable alternatives that are designed to minimize the adverse impacts or enhance the quality of the environment. *Id.*; *see also* 40 C.F.R. §§ 1502.1, 1508.11. That said, while NEPA ensures informed public decision-making, NEPA does not require an agency to arrive at a particular decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

An EIS must discuss: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(C). This analysis requires the study of the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. § 1508.25(c). A "[c]umulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and **reasonably foreseeable** actions[.]" 40 C.F.R. § 1508.7 (emphasis added). But, "[e]ven as to impacts that are sufficiently likely to occur such that they are reasonably foreseeable and merit inclusion, the FEIS

5

need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1251 (10th Cir. 2011) (citation omitted); 40 C.F.R. § 1500.1(b) ("Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.").

## III.    The Federal Coal Leases at Issue

In 2005, Ark Land Company submitted an application to the Bureau to lease federal coal reserves in an area of land adjacent to the existing Black Thunder mine. (Aplt. App. at 748). In 2006, BTU Western Resources, Inc., submitted an application to the Bureau to lease federal coal reserves in an area of land adjacent to the existing North Antelope Rochelle mine. (*Id.*). The Black Thunder and North Antelope Rochelle mines are located in the southern portion of the Powder River Basin, near the town of Wright, Wyoming. (*Id.*).

"In 2008, Wyoming PRB mines accounted for approximately 38.5 percent of the coal produced in the U.S." (Aplt. App. at 983). The four tracts at issue here accounted for less than half of the coal produced in the Wyoming PRB in 2008. (*See* Aplt. App. at 986-987) (once you exclude the Jacobs Ranch tracts, which were considered in the EIS, but are not subject to the instant litigation). "Coal coming out of the Wyoming PRB is mined using surface mining methods which are generally safer and less labor intensive than underground mining." (Aplt. App. at 983). "PRB

6

coal has competed well [] due to its low sulfur content, providing a way for electric generators to achieve acid rain reduction requirements. This makes it valuable in lowering sulfur dioxide ($SO_2$) pollution, as well as competitive mining costs when compared to delivered costs of coal from other coal producing areas." (*Id*.). In short, coal mined in the Powder River Basin has a number of attributes that are preferable to non-PRB coal, including cost.

Both of the proposed leases would extend the life of the mine to which they are adjacent by opening more coal reserves to mining once the existing recoverable coal is extracted. (*Id*.). At the time of its decision, the Bureau estimated that the remaining recoverable reserves of coal at both the Black Thunder and North Antelope Rochelle mines was approximately ten years' worth. (Aplt. App. at 860-61). The Bureau further estimated that the proposed leases would extend the life of each mine by between two to seven years. (Aplt. App. at 762-767, 770-773). Because the proposed leases would merely maintain existing operations at each respective mine for a longer period of time, as opposed to increasing existing mining in the near term, they are referred to as "maintenance" leases. (*See* Aplt. App. at 748).

After receiving the lease applications, the Bureau divided each respective lease application in two, creating four "Wright Area" lease applications – referred to as the South Hilight, North Hilight, South Porcupine, and North Porcupine tracts. (Aplt.

App. at 747). The Interest Groups' legal challenge relates to these four leases and the associated NEPA analysis prepared by the Bureau. (Aplt. Br. at 21-50).

## IV.    NEPA Compliance and Public Participation

### A.    The Environmental Impact Statement

On July 3, 2007, the Bureau published a notice of intent to prepare an EIS to analyze the anticipated impacts from leasing six tracts of coal-bearing land, including the two Hilight and the two Porcupine tracts. (Aplt. App. at 293). Later that month, the Bureau held a public scoping meeting in Gillette, Wyoming, to obtain public input on issues associated with leasing the tracts. (Aplt. App. at 293-94). On June 26, 2009, after two years of study, the Bureau published a notice of availability of the Wright Area Draft EIS and the opening of a public comment period. (Aplt. App. at 757). One month later, the agency held a public hearing in Gillette to obtain public input on the draft EIS and on the fair market value and maximum economic recovery of the proposed leases. (*Id.*). During the 60-day comment period, the Bureau received written comments from 17 individuals, agencies, businesses, and organizations as well as over five-hundred emails from other interested parties. (Aplt. App. at 294). The Bureau then prepared the final EIS, taking into account and responding to the comments received. (*Id.*),

In the thirteen-hundred-page final EIS, the Bureau considered the direct, indirect, and cumulative impacts of the proposed leases. Among other things, the

agency examined impacts to air and water quality, climate change, visual resources, socio-economics, and transportation. (Aplt. App. at 744-1004). The EIS reflects years of study, during which the public was afforded meaningful opportunities to participate in the decision-making process. The Bureau conducted this effort in order to satisfy NEPA's directive of ensuring informed decision-making and promoting public participation in the process.

**B.     Climate Change Considerations**

As one part of the analysis contained in the 2009 EIS, the Bureau considered the potential impacts of greenhouse gas emissions, global warming, and climate change that might result from the proposed maintenance leases. (Aplt. App. at 977). While the agency recognized that "[m]ost of the observed increase in globally-averaged temperatures since the mid-20th century is very likely due to the observed increase in anthropogenic greenhouse gas concentrations," the Bureau also recognized that "[g]lobal climate models are at this time imperfect and due to their uncertainties should not be used as a basis for public policy." (Aplt. App. at 979, 982).

With regard to the four lease tracts at issue here, the Bureau found that "[i]t is not possible to accurately project the level of $CO_2$ emissions that burning the coal from the [] tracts would produce due to the uncertainties about what emission limits would be in place at that time or where and how the coal in [the] tracts would be used if they are leased and the coal is mined." (Aplt. App. at 986). The Bureau's

uncertainty about the potential future impacts was driven, in part, by the fact that the

Black Thunder and North Antelope Rochelle mines had approximately ten years of

remaining life before the impact of the maintenance leases would even come into play.

(*See* Aplt. App. at 860-61). The Bureau concluded it could not connect the leased coal

to the larger effects of climate change:

> Although the effects of GHG emissions and other contributions to
> climate change in the global aggregate are estimable, given the current
> state of science it is impossible to determine what effect any given
> amount of GHG emissions resulting from an activity might have on the
> phenomena of global warming, climate change, or the environmental
> effects stemming from it. It is therefore not currently possible to
> associate any particular action and its specific project-related emissions
> with the creation or mitigation of any specific climate-related effects at
> any given time or place.

(Aplt. App. at 990). In so doing, the Bureau disclosed the potential impacts related to

climate change, while recognizing the agency's limited ability to assess the impact of

the maintenance leases on the global phenomenon of climate change.

##       C.       The Records of Decision

Following publication of the final EIS and completion of a 30-day comment

period, the Bureau issued a Record of Decision for each tract. (Aplt. App. at 294)

(South Hilight ROD) (March 1, 2011); (South Porcupine ROD) (August 10, 2011);

(North Porcupine ROD) (October 17, 2011); (North Hilight ROD) (February 1, 2012).

In each Record of Decision, the Bureau explained the rationale behind its decision to

offer the tracts in question for lease. (*E.g.*, Aplt. App. at 1056-1061). In short, the

Bureau found that it was in the public interest to offer the Wright Area tracts for competitive sale "so that these reserves are available for sale in the open coal market to meet the national coal demand that is expected to exist until at least 2035." (*Id*.). In so doing, the Bureau selected the "preferred alternative," which was to hold a competitive lease sale for the Wright Area tracts and issue leases to the successful bidders, rather than the "no action alternative," which would have rejected the applications outright. (Aplt. App. at 1063).

In reaching this decision, the Bureau determined that selecting the "no action alternative" was "unlikely to affect changes in the national electric generation portfolio." (Aplt. App. at 1057). The Bureau further found that denying the lease applicants the opportunity to mine coal "would not cause electric generators to stop burning coal." (*Id*.). Rather, the Bureau determined that, if it chose the no action alternative, electric generators would obtain replacement coal from other suppliers in the Power River Basin or elsewhere. (*E.g.*, Aplt. App. at 989) ("there are multiple other sources of coal that could supply the coal demand beyond the time that the Black Thunder [] and North Antelope Rochelle mines recover the coal in their existing leases").

### D.     Comments on the Draft and Final EIS by the Interest Groups

On August 25, 2009, the lead petitioner in this case, WildEarth Guardians, submitted comments to the Bureau on the draft EIS. (Aplt. App. at 716-743). As part

of those comments, WildEarth Guardians asserted that the Bureau incorrectly and improperly concluded that the climate change impacts from the "no action" alternative were not appreciably different than the climate change impacts from the preferred alternative, which was to grant the lease applications. (Aplt. App. at 725-26). Specifically, WildEarth Guardians alleged that, if the Bureau selected the "no action" alternative, there would be less coal available in the market. They further asserted that this would then lead to coal being more expensive, which would lead to decreased use of coal as a fuel, which in turn would result in decreased $CO_2$ emissions. (*Id.*). WildEarth Guardians claimed that the Bureau failed to adequately consider this market effect in the draft EIS.

In their comments on the draft EIS, WildEarth Guardians **did not** assert that the Bureau should have used an economic model to consider how the demand for coal would be impacted if the Bureau rejected the lease applications. (*Id.*). Nor did WildEarth Guardians inform the Bureau of the availability of such a model. (*Id.*).

On August 30, 2010, WildEarth Guardians, the Sierra Club, and Defenders of Wildlife jointly submitted comments to the Bureau on the final EIS. (Aplt. App. at 1006-1011). These groups incorporated by reference WildEarth Guardians' comments on the draft EIS and reiterated and restated them. (Aplt. App. at 1006). They did not, however, expand upon the "no action alternative" argument contained in WildEarth

12

Guardians' prior comments nor did they discuss the need for climate change modeling or the availability of such a model. (Aplt. App. at 1006-1011).

## V.    The Litigation Underlying this Appeal

Following the Bureau's issuance of the Records of Decision, the Interest Groups and several other advocacy organizations brought three separate lawsuits to challenge the Bureau's decisions with regard to the lease applications. (Aplt. App. at 417-420). In these consolidated cases, the plaintiff groups pursued a kitchen sink approach in attacking the Bureau's decisions, alleging numerous violations of law under a variety of federal statutes. (*Id.*).

On October 17, 2015, the United States District Court for the District of Wyoming issued a detailed opinion that rejected **all** of the arguments advanced by the various plaintiff groups. (Aplt. App. at 415-479); *WildEarth Guardians, v. U.S. Forest Serv.*, 120 F. Supp. 3d 1237 (D. Wyo. 2015). In so doing, the district court acknowledged the thoroughness of the Bureau's EIS that the Bureau prepared. (*Id.*).

Despite all of the arguments advanced by the plaintiff groups below, the Interest Groups only appeal the District Court's ruling on their narrow argument that the Bureau acted arbitrarily and capriciously when the agency found that the climate change impacts from the "no action" alternative were not appreciably different than the climate change impacts from the preferred, and ultimately chosen, alternative. (Aplt. Br. at 1).

## VI.    The Broader Context

The Interest Groups seek a permanent end to federal coal leasing in the United States, with a particular focus on the Powder River Basin. The lead petitioner in this appeal, WildEarth Guardians, advertises that its "aim is simple: to slow and ultimately stop the flow of coal from the Powder River Basin. **To do this, we are challenging every single new coal lease**" considered by the Bureau.[1] Holding this position, the Interest Groups have advanced myriad legal arguments in a number of cases. Yet, despite years of litigation, the Interest Groups have not prevailed in a single case challenging federal coal leasing in the Powder River Basin.

For example, the Interest Groups recently failed **twice** in their attempts to challenge the Bureau's NEPA analysis related to several coal leases in the Powder River Basin. *See WildEarth Guardians v. Salazar*, 880 F. Supp. 2d 77 (D.D.C. 2012), aff'd, *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir.  2013); *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014). The Interest Groups did not succeed in a broader challenge to coal leasing in the Powder River Basin as presently practiced. *WildEarth Guardians v. Salazar*, 783 F. Supp. 2d 61 (D.D.C. 2011). The Interest Groups also failed in a case attacking a Forest Service NEPA analysis of asserted climate impacts in the United States District Court for the District of

---

[1] *See, e.g.*, WildEarth Guardians, "The Powder River Basin – A Root Contributor to Global Warming," http://tinyurl.com/m6wb3nj (last visited Mar. 31, 2016).

Colorado. *WildEarth Guardians v. U.S. Forest Serv.*, 828 F. Supp. 2d 1223, 1239-41 (D. Colo. 2011). Lastly, the Interest Groups were unsuccessful in similar cases brought before the Interior Board of Land Appeals. *See WildEarth Guardians*, 183 IBLA 165 (2013), *Powder River Basin Res. Council*, 183 IBLA 83 (2012), and *Powder River Basin Res. Council*, 180 IBLA 119 (2010). In sum, this case and the subsequent appeal are just the latest in a long string of unsuccessful attempts by the Interest Groups to "slow and ultimately stop" the Bureau's leasing of federal coal in the Powder River Basin.

## SUMMARY OF ARGUMENT

The Interest Groups contend that the Bureau acted in an arbitrary and capricious manner when it analyzed the potential climate change impacts that might result from a competitive lease sale for four "maintenance" tracts of coal-bearing land in Wyoming's Powder River Basin. Specifically, the Interest Groups allege that the Bureau failed to properly consider the market effect of not leasing the tracts in question. The Interest Groups assert that not leasing the tracts would drive up the price of coal, which would then decrease demand for coal, thereby reducing the overall amount of $CO_2$ emitted by coal-fired power plants.

The Interest Groups are mistaken. The Bureau properly determined that, because replacement coal is readily available to the owner-operators of coal-fired power plants, the Bureau's decision, one way or the other, would not have a

15

meaningful impact on the overall market for coal. As a result, coal-fired power plants would emit essentially the same amount of $CO_2$ regardless of the Bureau's decision. In reaching this conclusion, the Bureau considered the relevant factors and presented a rational connection between the facts found and the choices made. As such, the Service's decision is entitled to deference and should be upheld.

The Interest Groups further assert that the Bureau violated applicable law when it did not use modeling to assess the potential market impact from the agency's decision not to adopt the "no action" alternative. As an initial matter, NEPA does not require the Bureau to conduct such modeling. In any event, the Interest Groups waived the ability to make this argument by (i) failing to raise the argument in their comments on the EIS, and (ii) failing to raise the argument before the district court.

The State of Wyoming respectfully requests that this Court uphold the decision of the District Court and deny the Interest Groups' appeal.

## ARGUMENT

## I.   Standard of Review

NEPA requires agencies to take a "hard look" at the potential environmental consequences of a proposed action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). When reviewing whether an agency took the requisite hard look, a court applies the arbitrary and capricious standard. *W. Watersheds Project v. BLM*, 721 F.3d 1264, 1273 (10th Cir. 2013); *Olenhouse v.*

*Commodity Credit Corp.,* 42 F.3d 1560, 1573-74 (10th Cir. 1994). Under that standard, an agency decision may be overturned only if the agency: "(1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment." *Olenhouse,* 42 F.3d 1574.

The arbitrary and capricious standard of review is "very deferential to the agency." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012) (quotations omitted). "A presumption of validity attaches to the agency action and the burden of proof rests with" the parties who challenge such action. *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (quotations omitted). A court's "deference is most pronounced in cases where, as here, the challenged decision involves 'technical or scientific matters within the agency's area of expertise.'" *W. Watersheds Project*, 721 F.3d at 1273 (quoting *Utah Envtl. Congress v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006)). Indeed, an EIS may be overturned "only for **substantial** procedural or substantive reasons." *Utahns for Better Transp. v. U.S. Dep't of Transp*., 305 F.3d 1152, 1164 (10th Cir. 2003), modified on reh'g, 319 F.3d 1207 (10th Cir. 2003) (emphasis added).

17

**II.    The Bureau properly considered the climate change impacts of the No Action Alternative.**

**A.    The Bureau's determination that the climate change impacts from the "preferred alternative" and the "no action alternative" were essentially equivalent was reasonable and supported by the record.**

When analyzing the climate change impacts from the various alternatives considered in the EIS, the Bureau determined that there was not a meaningful difference between the climate change impacts that would result from: (i) approving the lease applications as part of the "preferred alternative;" and (ii) rejecting the lease applications as part of the "no action" alternative. (*E.g.*, Aplt. App. at 1056-61). In support of this finding, the Bureau noted that most, if not all, of the coal that would be mined as a result of approving the lease applications would be used by coal-fired power plants. (*E.g.*, Aplt. App. at 989, 1058-59). And if the Bureau denied the lease applications by choosing the no action alternative, the owner-operators of the coal-fired power plants would obtain replacement coal from other sources. (*Id.*). As a result, the amount of $CO_2$ emitted would be essentially the same, thereby making the climate change impact a virtual wash between the two alternatives. (*E.g.*, Aplt. App. at 1056-61).

The Interest Groups assert that this finding was arbitrary and capricious. (Aplt. Br. 22-32). The core of their argument is based on the fact that coal extracted from the Powder River Basin typically enjoys cost advantages over coal mined elsewhere.

18

(Aplt. Br. at 22-32). So, the Interest Groups say, a reduction in the supply of PRB coal must have a market effect, which will then impact $CO_2$ emissions. (Aplt. Br. 26). And, according to the Interest Groups, the Bureau failed to consider this dynamic appropriately. (Aplt. Br. at 32). Specifically, the Interest Groups allege that the Bureau arbitrarily assumed that denial of the leases would result in consumers purchasing "perfect" replacement coal, thereby keeping the consumption of coal essentially static. (Aplt. Br. at 28-32). The Interest Groups claim that this assumption was arbitrary because consumers would be forced to acquire coal outside of the Powder River Basin if the Bureau adopted the no action alternative. (*Id.*). And because that non-PRB coal would be more expensive, the demand for coal would go down, which would result in reduced $CO_2$ emissions. (*Id.*).

As an initial matter, the entirety of the argument advanced by the Interest Groups amounts to the kind of "flyspecking" in which this Circuit consistently refuses to engage. *See, e.g., N.M. ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009). The record shows that the Bureau took a detailed "hard look" at the potential climate-related impacts of the proposed action. (Aplt. App. at 976-1004). This was sufficient under NEPA. *Richardson*, 565 F.3d at 704 ("short of a 'clear error of judgment' [the court asks] only whether the agency took a 'hard look' at information relevant to the decision"). Plaintiffs can always claim that federal agencies should have dug just a **little** deeper on a particular issue, but "[d]eficiencies in an EIS that are

19

mere 'flyspecks' [] will not lead to reversal" of a federal agency's decision. *Richardson*, 565 F.3d at 704. Yet that is what the Interest Groups seek here. This Court should reject their argument as a result.

In any event, the argument advanced by the Interest Groups arises from a faulty premise. The Interest Groups incorrectly assume that the owner-operators of coal-fired power plants would need to obtain replacement coal from outside the Power River Basin. (Aplt. Br. at 22-23). Not so. At the time that the Bureau conducted its environmental analysis and prepared the EIS, there were twelve active mines in the Powder River Basin. (Aplt. Appp. 986-987). At the same time, the mines related to this suit accounted for less than half of the coal extracted from the Powder River Basin in a given year. (Aplt. App. at 986-87). And the other mines in the PRB had excess permitted capacity to make up for lost production in the event that the Bureau selected the no action alternative and the applicant mines were to eventually close. (Aplt. App. 854). As a result, the owner-operators of coal-fired power plants could obtain replacement coal from the other mines in the Powder River Basin that account for the majority of PRB coal extraction, not to mention any new coal mines that might come online in the decade before the real world impact of denying the maintenance leases would be felt. This is the replacement coal scenario that the Interest Groups mistakenly claim cannot occur.

The Interest Groups may respond that the Bureau anticipated that the replacement coal would need to come from outside the Powder River Basin. (Aplt. Br. at 22-25). But while some of the Bureau's statements suggest this, others do not. (*E.g.*, Aplt. App. at 989) (implicitly recognizing that replacement coal could come from within the Powder River Basin). And given that enormous amounts of coal are extracted from mines in the Powder River Basin that are not related to the leases in question, the Interest Groups cannot reasonably argue that replacement coal **must** come from outside the Powder River Basin based solely on selected comments by the Bureau in the administrative record. To do so would amount to flyspecking. *See, e.g., Richardson*, 565 F.3d at 704. This Court should reject the argument as a result.

**B.    The ruling in *Mid States* is distinguishable from the facts in this case, and the ruling should not guide this Court's analysis as a result.**

The Interest Groups allege that this Court's analysis should be guided by the Eight Circuit's decision in *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003).[2] (*See* Aplt. Br. at 28-32). But *Mid States* is readily distinguishable from the facts in the instant case and should not guide this Court's analysis.

---

[2] The decision of the Colorado District Court in *High Country Conservation Advocates v. U.S. Forest Serv.,* 52 F. Supp. 3d 1174 (D. Colo. 2014), offers little for this Court to consider beyond the district court's decision to adopt the Eighth Circuit's reasoning in *Mid States*. (*Contra* Aplt. Br. at 29-30).

In *Mid States*, the Surface Transportation Board prepared an EIS that considered the environmental impacts of a "proposal to construct approximately 280 miles of new rail line to reach the coal mines of Wyoming's Powder River Basin." *Mid States,* 345 F.3d at 532. The Eighth Circuit found that the Surface Transportation Board violated NEPA by not considering the potential environmental impacts that would result from an increased supply of Powder River Basin coal, particularly due to its low cost and environmental benefits. *Id*. at 548-550. While that scenario seems somewhat analogous to the facts in the case at bar, in reality that is far from the truth.

There are a number of key distinctions between *Mid States* and this case. First, the **stated goal** of the new rail line in *Mid States* was to **increase** the availability of Powder River Basin coal and **lower** its price by removing a rail capacity bottleneck between the abundant coal supply in the Powder River Basin and the robust demand for PRB coal in the United States. *Id*. at 549. The Surface Transportation Board identified that goal in the draft EIS, and the *Mid States* court relied heavily on that fact in coming to its decision. *Id*. at 550. That is **not** the situation here. The purpose of the Wright Area leases is to **maintain**, not increase, the amount of Powder River Basin coal that is supplied to the market, (Aplt. App. at 748), which would have no direct effect on the price of coal. This distinction alone is enough to render *Mid States* inapposite.

22

Second, in *Mid States*, the Eighth Circuit was influenced by the fact that the plaintiffs informed the Surface Transportation Board during the public comment process about the availability of computer models to analyze how the change in cost and availability might affect consumer demand. *Mid States,* 345 F.3d at 550. That did not happen here. (Aplt. App. at 725-26). Whereas in *Mid States* the relevant federal agency was put on notice about available modeling, and the agency declined to conduct that modeling, here, the Interest Groups did not notify the Bureau of the availability of computer models to analyze the potential market changes that might result from granting the lease applications. *Mid States,* 345 F.3d at 550. This distinction also renders *Mid States* inapposite.

Lastly, in *Mid States* an increase in consumption of Powder River Basin coal was reasonably foreseeable because of the anticipated efficiencies created by the new rail line. Indeed, the Surface Transportation Board **predicted** this would occur in the agency's draft EIS. *Id*. at 549.  If the Surface Transportation Board approved the rail project, more Powder River Basin coal would come to market at a cheaper price. *See id.* at 548. Not so here. The goal of the preferred alternative was to maintain, not increase, the availability of PRB coal. (*See* Aplt. App. at 748). And even if the Bureau chose the no action alternative, it was entirely probable that other mines within the Powder River Basin would pick up the slack, thereby keeping the supply of PRB coal constant. In short, a change in availability and price based on the lease approvals alone

was not reasonably foreseeable. That is a totally different scenario than the one considered by the Eighth Circuit in *Mid States*. And indeed, at least two courts, including the Eighth Circuit, have distinguished *Mid States* and limited its applicability on similar foreseeability grounds. *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096 (8th Cir. 2005); *Sierra Club v. Clinton*, 746 F. Supp. 2d 1025 (D. Minn. 2010).

In *Arkansas Wildlife*, the United States Army Corps of Engineers prepared an EIS to consider the potential impacts related to a water usage plan that the Corps estimated would cost over three hundred million dollars. *Ark. Wildlife,* 431 F.3d at 1098-99. The plaintiffs alleged that the Corps "improperly deferred the study of cumulative impacts of reasonably foreseeable action" in the EIS and relied on *Mid States* to support their argument. *Id*. at 1102. In response, the Eighth Circuit limited the applicability of its ruling in *Mid States*. *Id*. Specifically, the Eighth Circuit limited the applicability of *Mid States* to cases where an agency: (i) recognized that a particular outcome was reasonably foreseeable; (ii) stated that it would consider the impacts from that reasonably foreseeable outcome; and (iii) then failed to do so. *Id*. (finding reliance on *Mid States* to be misplaced where these factors are not present). This Court should refuse to follow *Mid States* in this case for the same reason.

Contrary to the allegations of the Interest Groups, it was not reasonably foreseeable that the lease approvals would **increase** the production of coal from the

Powder River Basin. (*See* Aplt. App. at 748). To the contrary, the leases were merely intended to **maintain** the production of coal in the Powder River Basin. (*Id.*). It was also not reasonably foreseeable that denying the lease applications would **reduce** the production of coal from the Powder River Basin, given the ability of other mines in the Powder River Basin to pick up the slack. (*See* Aplt. App. at 989). In short, reliance on *Mid States* fails here for the same reason it failed in *Arkansas Wildlife*.

In *Sierra Club*, the State Department prepared an EIS to consider the potential impacts of authorizing the construction of two pipelines that were designed to carry petroleum products between Canada and the United States. *Sierra Club,* 746 F. Supp. 2d at 1028-29. Relying on *Mid States*, the plaintiffs alleged that the State Department failed to adequately consider the effect that increased availability of crude oil from the tar sands of Canada would have on the development of alternative energy sources, like wind and solar, in the United States. *Id.* at 1046. The district court rejected this argument, based on the fact that, unlike in *Mid States*, "there has been no showing that it is reasonably foreseeable that the oil being transported through the AC Pipeline will increase overall oil consumption in the United States. *Id.* That is **precisely** the situation here, where it is not reasonably foreseeable that choosing the no action alternative will reduce coal consumption in the United States. (*See* Aplt. App. at 1057). This Court should reject any reliance on *Mid States* for the reasons spelled out in *Sierra Club*.

In sum, the facts that led to the Eighth Circuit's decision in *Mid States* are not present in this case. As a result, the decision is inapposite and should not guide this Court's analysis.

**C.    The Bureau was not required to conduct modeling of the potential market impacts from adopting the "no action" alternative, and the Interest Groups waived the right to raise this argument.**

The Interest Groups further allege that the Bureau acted in an arbitrary and capricious manner because the agency did not use an economic model to consider how the demand for coal might have been impacted if the Bureau rejected the lease applications by choosing the no action alternative. (Aplt. Br. at 32-36). But, while the use of economic modeling may be appropriate in certain circumstances, NEPA does not **require** agencies to use economic models for every decision. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d at 1251 (stating that "the FEIS need only furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project"). Instead, this Court "must examine the administrative record, as a whole, to determine whether the [agency] made a reasonable, good faith, objective presentation of those impacts sufficient to foster public participation and informed decision making." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1177 (10th Cir. 1999).

Here, the Bureau determined that the amount of $CO_2$ that would be emitted under the preferred alternative and the no action alternative was essentially the same

because replacement coal would be available if the Bureau selected the no action alternative. (Aplt. App. at 1057). Given the vast amount of coal available in the United States and the Powder River Basin, the Bureau's determination was reasonable and in good faith. *See Dombeck*, 185 F.3d at 1177. Accordingly, the Court should disregard the modeling argument.[3] *Id*.

In any event, the Interest Groups waived the right to make this argument by: (i) failing to raise the argument in their comments on the EIS; and (ii) failing to raise the argument before the district court. "[C]ourts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *Gilmore v. Weatherford*, 694 F.3d 1160, 1169 (10th Cir. 2012) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). This requirement "allows agencies to take into account the specific facts of each matter, and to change course as appropriate." *Id*. (internal citation omitted). Accordingly, "[i]t is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and

---

[3] Even if this Court finds that the Bureau should have conducted modeling, the agency's decision not to do so was harmless error, given the relatively trivial impact that any reduction in $CO_2$ emissions that might result from the no action alternative would have on the global phenomenon of climate change. *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings. The harmless error rule is incorporated in the judicial review section of the Administrative Procedure Act[.]").

will not be considered by a court on review." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1149 (D.C. Cir. 2005) (citations omitted). And a litigant cannot circumvent this principle by arguing that their generalized comments to an agency encompassed a more specific argument developed later in litigation. *Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (stating that the court requires "the argument [petitioner] advances" to be raised before the agency, not merely the same general legal issue) (quoting *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1291 (D.C. Cir. 2004) (per curiam)).

In their comments on the draft EIS, the Interest Groups informed the Bureau of their belief that the agency neglected to properly consider the potential market effects from choosing the no action alternative. (Aplt. App. at 725-26). But the Interest Groups **did not** inform the Bureau of the availability of any modeling during the comment period. *See id*. As such, the Interest Groups waived the ability to make the argument that the Bureau should have used modeling in the judicial review context. *Advocates for Highway & Auto Safety*, 429 F.3d at 1149. Accordingly, this Court should disregard the modeling argument.

In addition, this Court should exercise its discretion not to hear the modeling argument, because it was not raised before the district court. *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991) ("the general rule [is] that an appellate court will not consider an issue raised for the first time on appeal") (citation omitted).

28

"Exceptions to this rule are rare and generally limited to cases where the jurisdiction of a court to hear a case is questioned, sovereign immunity is raised, or when the appellate court feels it must resolve a question of law to prevent a miscarriage of justice." *Id.*; *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) (declaring that the Tenth Circuit "exercise[s] [its] discretion to hear issues for the first time on appeal only in the most unusual circumstances") (citation omitted). That is not the situation here.

Just as with the comments that the Interest Groups submitted to the Bureau, the Interest Groups neglected to raise the issue of economic modeling before the district court. (Aplt. Br. at 33-35). As a result, the Interest Groups waived the right to raise the argument on appeal. *See Lyons*, 994 F.2d at 721.

## CONCLUSION

For the foregoing reasons, the State of Wyoming respectfully requests that this Court find in favor of the Bureau and deny this appeal.

## STATEMENT ON ORAL ARGUMENT

This case involves complicated issues of law, and Wyoming believes oral argument will benefit the Court. Accordingly, Wyoming asks that this Court set the case for oral argument once the parties have fully briefed the merits.

Submitted this 4th day of April, 2016.

/s/ Erik Petersen
Erik Petersen (Wyo. State Bar No. 7-5608)
Michael J. McGrady (Wyo. Bar No. 6-4099)
Wyoming Attorney General's Office
2320 Capitol Avenue
Cheyenne, WY 82002
(307) 777-6946
(307) 777-3542 *facsimile*
erik.petersen@wyo.gov
mike.mcgrady@wyo.gov
*Counsel for Intervenor-Respondent-Appellee*
*State of Wyoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the typeface, typestyle, and word count requirements of Fed. R. App. P. 32. This brief contains 6,718 words excluding those portions of the brief exempted from the word count requirement by Fed. R. App. P. 32(a)(7). I relied on Microsoft Word 2013 to determine the final word count in this proportionally-spaced brief.

*/s/ Erik Petersen*
Erik Petersen

## CERTIFICATES OF SERVICE, DIGITAL SUBMISSIONS
## AND PRIVACY REDACTIONS

I hereby certify that on this 4th day of April, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit via the appellate CM/ECF system. The parties in this case will be served electronically by that system.

I hereby certify that all required privacy redactions have been made pursuant to 10th Cir. R. 25.5; that the ECF submission is an exact copy of the hard copies filed with the Clerk; and that the digital submissions have been scanned for viruses with the Symantec™ Endpoint Protection, version 12.1.6608.6300, Virus Definition File dated April 03, 2016 r34 and, according to the program, is free of viruses.

*/s/ Erik Petersen*_____
Erik Petersen