ORAL ARGUMENT REQUESTED

No. 15-8109

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

WILDEARTH GUARDIANS, ET AL.

Petitioners-Appellants

v.

UNITED STATES BUREAU OF LAND MANAGEMENT,

Respondent-Appellee,

WYOMING MINING ASSOCIATION, ET AL.,

Intervenors-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
NO. 2:13-CV-00042-ABJ (JUDGE ALAN B. JOHNSON)

_____

**RESPONSE BRIEF FOR THE FEDERAL APPELLEE**

_____

*of Counsel*
PHILIP C. LOWE
U.S. Department of the Interior
Rocky Mountain Regional Solicitor's
Office

JOHN C. CRUDEN
  *Assistant Attorney General*

JOHN S. MOST
ANDREW C. MERGEN
MICHAEL T. GRAY
  *Attorney, Appellate Section*
  *Environment and Natural Resources Div.*
  *U.S. Department of Justice*
  *701 San Marco Blvd.*
  *Jacksonville, FL 32207*
  *(202) 532-3147*
  *michael.gray2@usdoj.gov*

# TABLE OF CONTENTS

Table of Contents ........................................................................................ ii

Table of Authorities .................................................................................. iv

Statement of Related Cases ................................................................... viii

Statement of Jurisdiction ........................................................................ 1

Statement of the Issue .............................................................................. 1

Statement of the Case .............................................................................. 2

        A.    Statutory Background ................................................................. 3

             1.    The Federal Land Policy and Management Act of 1976 ................................................................................ 3

             2.    The Mineral Leasing Act of 1920 ................................ 4

             3.    The National Environmental Policy Act of 1969 ............... 5

        B.    Factual Background ................................................................... 7

             1.    The Hilight Tracts ....................................................... 7

             2.    The Porcupine Tracts. ................................................. 8

             3.    NEPA Compliance, Public Participation, and the Final EIS's Consideration of Climate Change ..................... 9

        C.    Procedural Background ............................................................ 15

Summary of Argument ............................................................................ 16

Standard of Review ................................................................................. 17

Argument ................................................................................................. 18

      I.    BLM's analysis of the comparative climate-change impacts of the action and no-action alternatives was reasonable ..................... 18

A.    BLM fully disclosed the expected greenhouse gas emissions from burning all of the leased coal reserves to generate electricity. ........................................................................ 19

B.    BLM's discussion of the predicted coal market was reasonable. ...................................................................... 21

1.    BLM did not assume "perfect substitution" or ignore basic principles of supply and demand.................... 22

2.    BLM did not misread the expert reports on which it relied.................................................................... 31

3.    BLM provided sufficient detail to comply with NEPA and was not required to use the models that the Plaintiffs' prefer.............................................. 33

II.    Even if BLM's analysis of the no-action alternative was erroneous, any error was harmless under NEPA. ...................................... 38

Conclusion.......................................................................................... 40

# TABLE OF AUTHORITIES

**CASES:**

*Balt. Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ............................................................. 7, 27, 31, 35

*Biodiversity Conserv. All. v. U.S. Forest Serv.*,
  765 F.3d 1264 (10th Cir. 2014) ..................................... 36

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ......................................................... 34

*Coal. on Sensible Transp., Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) ......................................... 37

*DOT v. Pub. Citizen*,
  541 U.S. 752 (2004) ......................................................... 20

*Forest Guardians v. U.S. Forest Serv.*,
  495 F.3d 1162 (10th Cir. 2007) ..................................... 37

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
  914 F.2d 1174 (9th Cir. 1990) ......................................... 4

*High Country Conserv. Advocates v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) ........................... 21

*Lee v. U.S. Air Force*,
  354 F.3d 1229 (10th Cir. 2004) ................................... 6, 37

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ......................................................... 17

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ................................................. 6, 7, 27, 35

*Mayo Found. v. STB*,
  472 F.3d 545 (8th Cir. 2006) ......................................... 30

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ........................................................ 20, 21, 28, 30, 34

*Morris v. U.S. NRC*,
    598 F.3d 677 (10th Cir. 2010) ........................................................ 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................ 17

*N.M. ex rel. Richardson v. BLM*,
    565 F.3d 683 (10th Cir. 2009) ........................................................ 38, 39

*Nat. Res. Def. Council v. Jamison*,
    815 F. Supp. 454 (D.D.C. 1992) ........................................................ 4

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................ 4

*Olenhouse v. Commodity Credit Corp.*,
    42 F.3d 1560 (10th Cir.1994) ........................................................ 34

*Prairie Band Pottawatomie Nation v. FHA*,
    684 F.3d 1002 (10th Cir. 2012) ........................................................ 38, 39

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................ 6, 21, 25, 26, 27

*Shinseki v. Sanders*,
    556 U.S. 396 (2009) ........................................................ 38

*Sierra Club v. Van Antwerp*,
    526 F.3d 1353 (11th Cir. 2008) ........................................................ 6, 35

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ........................................................ 34

*Tyler v. City of Manhattan*,
    118 F.3d 1400, 1403–04 (10th Cir.1997) ........................................................ 34

*U.S. Steel Corp. v. EPA*,
    595 F.2d 207 (5th Cir. 1979) ........................................................ 39

*Utah Envtl. Congress v. Bosworth,*
    443 F.3d 732 (10th Cir. 2006) ................................................................ 18

*Utah Envtl. Cong. v. Richmond,*
    483 F.3d 1127 (10th Cir. 2007) ....................................................... 31, 32

*Utahns for Better Transp. v. U.S. DOT,*
    305 F.3d 1152 (10th Cir. 2002) ......................................................... 6, 36

*Utahns for Better Transp. v. U.S. DOT,*
    319 F.3d 1207 (10th Cir. 2003) ......................................................... 6, 36

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
    435 U.S. 519 (1978) ............................................................................. 34

*W. Watersheds Project v. BLM,*
    721 F.3d 1264 (10th Cir. 2013) ..................................................... 17, 18

*Wolfe v. Barnhart,*
    446 F.3d 1096 (10th Cir. 2006) ........................................................... 18

*Wyoming Farm Bureau Fed'n v. Babbitt,*
    199 F.3d 1224 (10th Cir. 2000) ........................................................... 34

## STATUTES:

Administrative Procedure Act
    5 U.S.C. §§ 701-706 ......................................................................... 1, 17
    5 U.S.C. § 706(2) ................................................................................. 38
    5 U.S.C. § 706(2)(A) ............................................................................ 17
    5 U.S.C. § 706(2)(E) ............................................................................ 17

Federal Coal Leasing Amendments Act
    30 U.S.C. § 184 ..................................................................................... 4
    30 U.S.C. § 191 ..................................................................................... 4
    30 U.S.C. § 201-209 .............................................................................. 4

Federal Land Policy and Management Act
    43 U.S.C. § 1702(e) ............................................................................... 3
    43 U.S.C. § 1712(a) ............................................................................... 3

43 U.S.C. § 1712(e) ............................................................ 4

Mineral Leasing Act
    30 U.S.C. §§ 181-287 .................................................. 4
    30 U.S.C. § 201(a)(1) ................................................... 4

National Environmental Policy Act
    42 U.S.C. §§ 4321-4347 ........................................... 1, 6
    42 U.S.C. § 4321 ........................................................ 6
    42 U.S.C. § 4332(2)(C) .............................................. 6
    42 U.S.C. § 4332(2)(C)(iii) ....................................... 6

28 U.S.C. § 1291 ................................................................. 1
28 U.S.C. § 1331 ................................................................. 1

40 C.F.R. § 1500.1(c) ........................................................ 6

40 C.F.R. § 1502.3 ............................................................. 6

40 C.F.R. § 1502.16 ........................................................... 6

40 C.F.R. § 1502.22 ........................................................... 13

40 C.F.R. § 1508.7 ............................................................. 6

43 C.F.R. § 1601.0-5 ......................................................... 4

43 C.F.R. § 1601.0-5(n) ..................................................... 3

43 C.F.R. § 1610.5-3 ......................................................... 4

43 C.F.R. Subpart 3400 ..................................................... 4

43 C.F.R. § 3400.0-5 ......................................................... 5

43 C.F.R. § 3420.1-4(e) ..................................................... 5

43 C.F.R. § 3422.3-4 ......................................................... 5

43 C.F.R. Subpart 3425 ..................................................... 5

43 C.F.R. § 3425.4(a)(1) ............................................... 5, 27, 35

72 Fed. Reg. 32,642 (June 13, 2007) ............................. 9, 11, 12

81 Fed. Reg. 17720 (March 30, 2016) ............................. 5, 38

Fed. R. App. P. 4(a)(1)(B) ................................................ 1

## STATEMENT OF RELATED CASES

There are no prior or related appeals to report.

## STATEMENT OF JURISDICTION

The Plaintiffs claim that the Bureau of Land Management, which is abbreviated to BLM, violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4347, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. The district court had jurisdiction under 28 U.S.C. § 1331.

On August 17, 2015, the district court issued final judgment in favor of BLM. App. 415.[1] On October 7, 2015, the Plaintiffs filed a timely notice of appeal. App. 483; Fed. R. App. Proc. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

When considering whether to issue four coal-mining leases in the Powder River Basin that would extend the mine life of existing mines from about two to six years, BLM concluded, given the length of the extension and the then-available information about market dynamics, that not issuing maintenance leases for existing mines—that is, the "no-action alternative"—was not likely to "consequentially reduce the overall rate of national coal consumption by electric generators," and therefore would not appreciably impact the amount of carbon dioxide emitted from national coal generation over the life of the leases.

---

[1] Citations to "App. __" are to the Appellants' Appendix. Citations to "Supp. App. ___" are to the Appellee's Appendix filed with this brief. Citations to "AR __" are to the administrative record.

1. Whether BLM's approach to accounting for impacts associated with the combustion of coal from alternative sources in the no-action alternative, and ultimate decision to issue the leases, is arbitrary or capricious?

2. If BLM's methodology and conclusion that the no action alternative would not consequentially reduce the overall rate of national coal consumption by electric generators over the life of these four leases was erroneous, was that error harmless?

## STATEMENT OF THE CASE

Coal-mining companies in Wyoming's Powder River Basin used a statutory procedure to ask BLM to offer new leases that, if issued, would allow the continued mining of coal at existing production levels and extend the life of the operators' mines. BLM thoroughly examined the environmental impacts of issuing the leases, including a thorough analysis of the impacts on climate change from the mining itself and from the burning of the coal to generate electricity. BLM issued an environmental impact statement setting forth its analysis of those climate change impacts, and after considering public comment, decided to issue the leases. The Plaintiffs filed this action seeking to set aside that decision, and raised numerous claims. The district court ruled in favor of the government.

The Plaintiffs now appeal, and on appeal raise only one issue: They contend that BLM did not make a fully informed choice because it overestimated the carbon-dioxide emissions from burning coal to generate electricity if the leases were not

issued—that is, the emissions under the "no-action alternative." Thus, this appeal is not about whether BLM failed to disclose the climate change impacts associated with the operation of the mine because BLM clearly did so. Instead, this appeal centers on the relatively narrow question of whether BLM's approach to accounting for impacts associated with the combustion of coal from alternative sources in the no-action alternative is legally sufficient.

### A.    Statutory Background

This appeal involves only a claim that BLM failed to properly account for the carbon-dioxide emissions of the no-action alternative, and thus violated the National Environmental Policy Act, a statute described in more detail below. But BLM's leasing decision, and its NEPA analysis of that decision, which did disclose climate change impacts, were informed by and complied with two substantive statutes, which we describe first for background and context.

### 1.    The Federal Land Policy and Management Act of 1976

Under FLPMA, BLM manages the public lands, including leasing those lands for coal mining, *see* 43 U.S.C. § 1702(e), by a multi-step planning and decisionmaking process. BLM first develops a Resource Management Plan for a planning area, which sets forth long-term goals and objectives for management of public lands. *Id.* § 1712(a). That Plan establishes, among other things, lands to be opened or closed to leasing of energy resources, and the conditions under which development of the resources should occur within the planning area. 43 C.F.R. § 1601.0-5(n); *see also*

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 71 (2004). A Plan is not a decision to undertake site-specific action. 43 C.F.R. § 1601.0-5. Instead, BLM makes separate, project-specific land-use decisions conforming to the Plan. 43 U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3; *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1178 (9th Cir. 1990).

### 2.    The Mineral Leasing Act of 1920

The Mineral Leasing Act, 30 U.S.C. §§ 181-287 ("MLA"), authorizes the Secretary of the Interior to dispose of federal coal deposits to citizens of the United States, associations of its citizens, or corporations organized under the laws of the United States. Disposition of federal coal "implicate[s] a large number of overlapping statutory mandates," *Natural Res. Def. Council, Inc. v. Jamison*, 815 F. Supp. 454, 456 (D.D.C. 1992), including the MLA, as amended by the Federal Coal Leasing Amendments Act of 1976, 30 U.S.C. §§ 184, 191, 201-209, 352 (1988), and FLPMA. The Act provides that the Secretary shall, on request of a qualified applicant or on his own initiative, "offer [coal] lands for leasing," and "award leases thereon by competitive bidding." 30 U.S.C. § 201(a)(1).

BLM has promulgated regulations implementing the statutory process for offering coal lands for leasing, which are codified at 43 C.F.R. Subpart 3400.[2] The

---

[2] We note throughout this brief that BLM's determinations, at issue in this case, were based on then-available information with respect to scientific analysis and market dynamics. And information with respect to scientific analysis and markets continues to evolve. On January 15, 2016, the Secretary of the Interior initiated a comprehensive review of the federal coal program by issuing Order No. 3338 and directing BLM to

leasing process begins with land-use planning, in which BLM identifies lands suitable for coal leasing. *Id.* § 3420.1-4(e). Sales are currently conducted through the "lease-by-application" process, which is initiated by those who intend to apply for the lease. *See* 43 C.F.R. Subpart 3425. For a federal coal lease to issue, the highest bid must meet or exceed fair market value, as determined by BLM's economic evaluation and public input. 43 C.F.R. § 3425.4(a)(1); 43 C.F.R. § 3400.0-5. Before leasing, BLM must comply with NEPA and the Endangered Species Act, and consult with the Attorney General to ensure anti-trust compliance. 43 C.F.R. § 3422.3-4.

### 3.     The National Environmental Policy Act of 1969

With that background in mind, this appeal involves a claim that BLM has violated the National Environmental Policy Act. NEPA is a procedural statute that does not require substantive results. It serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed federal actions and insuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See*

---

prepare a comprehensive Programmatic EIS. BLM published a notice of intent to prepare the Programmatic EIS on March 30, 2016.  81 Fed. Reg. 17720.  As part of its comprehensive review of the Federal coal program, the Programmatic EIS is expected to "examine how best to measure and assess the climate impacts of continued Federal coal production, transportation, and combustion" and that examination "will include evaluation of potential substitution effects from any changes in Federal coal production." 81 Fed. Reg. at 17725.  The Programmatic EIS will identify the most reasonable approaches for the future so that decisions, similar to the decisions at issue here, will be informed by the Programmatic EIS going forward.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA's intent is to focus the attention of agencies and the public on a proposed action so that its environmental consequences may be studied before the action is implemented. 42 U.S.C. § 4321; 40 C.F.R. § 1500.1(c); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

To assist in meeting those goals, NEPA requires preparation of an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.3. The EIS must examine, among other things, "alternatives to the proposed action," and the project's direct, indirect, and cumulative impacts. 42 U.S.C. § 4332(2)(C)(iii); 40 C.F.R. §§ 1502.16, 1508.7. NEPA incorporates a "rule of reason" that governs the extent and detail of an EIS. *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004). Thus, agencies are entrusted by Congress to determine not just the impact of their actions, but also the extent to which any impact needs to be studied consistent with the rule of reason. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008) (expert agencies are entitled to deference "not only when reviewing decisions like what evidence to find credible . . . but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue"); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002) *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003)

(noting rule of reason "applies both to which alternatives the agency discusses and the extent to which it discusses them").

Judicial review of agency NEPA compliance is deferential and reflects NEPA's rule of reason. *Marsh*, 490 U.S. at 375. The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983). In a case like this, where an agency is "making predictions within its area of special expertise" as opposed to simple findings of fact, a reviewing court must "generally be at its most deferential." *Id.* at 103.

### B.     Factual Background

This case involves applications for new coal leases under the "leasing-by-application" regulatory process. In all, BLM considered six tracts in its EIS, and has decided to offer for lease four of them. Three of the four tracts, the North and South Porcupine and South Highlight tracts, have been leased. The fourth, the North Highlight tract, has not yet been offered. BLM's decisions to offer all four leases are challenged here.

### 1.     The Hilight Tracts

On October 7, 2005, Ark Land Company, a subsidiary of Arch Coal, Inc., applied to lease federal coal reserves in a tract of land adjacent to the Black Thunder Mine in Campbell County, Wyoming. App. 486. The proposed lease would maintain mining operations at the existing Black Thunder Mine, and is thus referred to as a

"maintenance" lease. Mining operations at this and other mines on federal lands in Wyoming must conform to a mine plan approved by Interior's Assistant Secretary for Land and Minerals, on recommendation of Interior's Office of Surface Mining Reclamation and Enforcement, and must also conform to mining and water quality permits issued by the Wyoming Department of Environmental Quality. BLM examined Ark Land Company's application and, to promote competition, decided to process it as two tracts, North and South Hilight. Thus, if decisions were made to lease the tracts, a separate lease sale would be held for each tract. BLM then submitted the application for review by the Powder River Regional Coal Team (a group with federal, state, county, and Native American members represented). At an April 19, 2006 public meeting in Casper, Wyoming, the Regional Coal Team recommended that BLM proceed with environmental analysis and leasing. App.487.

## 2.    The Porcupine Tracts

On September 29, 2006, BTU Western Resources, Inc. ("BTU Western"), a subsidiary of Peabody Energy Corporation, filed an application to lease coal in three tracts of land adjacent to the existing North Antelope Rochelle Mine. App. 487. BTU Western modified its application on October 12, 2007, expanding the acreage and designating just two tracts, instead of three; specifically, the North and South Porcupine tracts. App. 487. BLM reviewed the modified tract configuration and, as with the Hilight tracts, decided to process the application as two separate tracts. BLM

then submitted the application for review by the Regional Coal Team, which

recommended that BLM proceed with leasing. App. 487.

### 3.    NEPA Compliance, Public Participation, and the Final EIS's Consideration of Climate Change

On July 3, 2007, BLM published in the Federal Register a notice of intent to

prepare an EIS to analyze leasing the two Hilight and two Porcupine tracts, as well as

the West Hilight and West Jacobs Ranch tracts, as to which no leasing decision has

been made to date. App. 486-87. After a public scoping process and nearly two years

of study, BLM published a notice of availability of the Wright Area Draft EIS and the

opening of a public comment period. 72 Fed. Reg. 32,642; App. 713. The agency held

a public hearing on the Draft EIS, and on fair market value and maximum economic

recovery of the proposed leases. App. 1061-62. During the 60-day comment period,

BLM received written comments from 17 individuals, agencies, businesses, and

organizations as well as over 500 emails from other interested parties. *Id.* Among the

Plaintiffs' many comments was a less than two-page comment claiming generally that

the no-action and action alternatives would have different climate impacts. App. 725-

26.

BLM then prepared the Final EIS, App. 744, taking into account, and

responding to, the comments received. Supp. App. 35 (BLM consolidated response to

comments). The agency examined, among other things, impacts on air and water

quality, climate change, wetlands, soils, vegetation, wildlife, land use, recreation,

cultural resources, visual resources, socio-economics, and transportation. AR 308-635 (direct and indirect impacts), AR 636-792 (cumulative impacts).

In particular, the agency took a hard look at climate-change impacts. The Final EIS examines climate change in two sections, in Chapter 3.0 ("Affected Environment and Environmental Consequences"), Supp. App. 2, and in Chapter 4 ("Cumulative Environmental Consequences), App. 976-1004.

Chapter 3 identifies the commonly occurring greenhouse gases, describes the greenhouse-gas effect, and discusses the considerable scientific inquiry into causes of climate change and expected trends. Supp. App. 2. Chapter 3 acknowledges that greenhouse gases would be released during mining operations, and identifies the sources of those emissions (predominantly, fuel for vehicles and equipment, as well as electricity used in mining operations, methane released when coal is first exposed, and blasting of overburden). Supp. App. 3-4. Table 3-24 estimates likely annual production of $CO_2$–equivalents ($CO_2e$) from mining operations. Supp. App. 4 (predicting 2.5 million tons of emissions per year, based on likely production rates, a figure representing about 3.61% of expected 2020 state-wide $CO_2e$ emissions). The Final EIS also explains that there would be increased emissions as compared to current operations due to hauling the increased coal and overburden over longer haul distances and due to overburden thickness. Supp. App. 4. In addition, it provided annual estimates for methane vented during mining operations, and expressed them as a percentage of total U.S. methane emissions. Supp. App. 5.

The Final EIS acknowledges that coal produced from the Wright Area leases would likely be used in coal-fired power plants to generate electricity. Supp. App. 2, 4. It explained that greenhouse gases were not regulated as pollutants in Wyoming, but noted that there is "consensus in the international community that . . . global climate change is occurring and that it should be addressed in governmental decision making." *Id.* Further, the Final EIS notes a number of greenhouse gas mitigation strategies being employed at the mines (even though permits do not require greenhouse gas emissions controls). None of the analysis in Chapter 3 is challenged in this appeal.

In Chapter 4, the Final EIS examines the anthropogenic causes of the "recent historic rise in global mean temperatures," App. 977, including growth in human population (from one billion in 1780, to two billion in 1930, to four billion in 1974), the corresponding growth in energy demand for heat, transportation, and machinery, and reductions in natural carbon sinks (for example, clearing of forest for agricultural use), as well as natural causes of climate variability, such as large wildfires, solar variability, volcanoes, and clouds. App. 977-82. The Final EIS examines and summarizes the findings of the 2007 Synthesis Report of the Intergovernmental Panel on Climate Change ("IPCC"), AR 4975, which discussed, among other things, sea-level rise, the significant contributions of anthropogenic sources, possible decreased water resources in various regions of the planet, and possible irreversible impacts, App. 979-81.

Chapter 4 also recognizes the near certainty that coal to be mined in the Powder River Basin would be burned to generate electricity, thus producing greenhouse-gas emissions. App. 985-86. In light of this, the Final EIS enumerates a series of important statistics on coal production, electricity generation, and contributions of combusted Wright Area coal to atmospheric greenhouse-gas levels. First, the Final EIS explains that about half of the electricity generated in the United States derives from coal, and that demand for power is increasing worldwide. App. 982. Second, the Final EIS states that total U.S. coal production in 1990 was 1,029 million tons, and increased to 1,161 million tons by 2006, a 12.9% increase. App. 983. Third, it notes that Powder River Basin mines produced about 452 million tons of coal in 2008, which, when burned, would produce 750 million tons of $CO_2$, roughly 35% of total U.S. $CO_2$ emissions from coal. *Id.* Fourth, it estimates that $CO_2$ emissions in the United States from all sources totaled 5,839 million tons, and that this figure represents about 83% of total U.S. greenhouse gas emissions. App. 984.

In Table 4-37, the Final EIS estimates annual coal production and corresponding $CO_2$ emissions from *all* Powder River Basin mines in 2010, 2015, and 2020, under two production scenarios, upper and lower. App. 985. The Final EIS uses those two production scenarios because it recognizes that economic factors that are not easily predicted influence rates of coal production. In Table 4-39, the Final EIS presents, in comparative form, predicted annual production for all six Wright Area tracts, the corresponding $CO_2$ emissions, and the incremental $CO_2$ emissions that

would be added under the proposed action and the selected alternative. App. 987. None of that analysis in Chapter 4 is challenged in this appeal.

In addition, the Final EIS explains that while the scientific community is in substantial agreement as to climate change, there are "uncertainties regarding how climate change may affect different regions." App. 980 (citing a report of the National Academy of Sciences). The Final EIS therefore also identified the possible effects of climate change that could occur in various regions of the world, including greater warming in winter than in summer, increased water vapor in the atmosphere, reduced soil moisture, increased drought, increased wild fire (along with increased fire severity and longer fire seasons), altered stream-flow patterns, increased occurrence of pests and invasive species, reduction in overall biodiversity, and enhanced heavy storm events. App. 980-81.

BLM did not analyze specific incremental impacts to climate change that could result from the challenged mining operations and corresponding combustion of coal. That is because the scientific methods to predict the incremental degree to which the leasing decisions may impact global climate change and local climate conditions were not available when BLM conducted its analysis. 40 C.F.R. § 1502.22; App. 989-90. The Plaintiffs do not challenge BLM's decision in this regard on appeal.

Finally, BLM provided a detailed response to the comments received, including a response to the comment on the issue raised in this appeal. Supp. App. 35, 39-41, 48-50. BLM noted that the EIS assumes that all of the coal would be used for electric

power generation and gave an "upper estimate" of the resulting greenhouse-gas emissions. Supp. App. 40. BLM then noted that "coal-fired electric generating plants are the cornerstone of the nation's central power configuration" and that the final EIS had been revised "to provide additional information regarding the projected electric generation portfolio of the United States." Supp. App. 48. Thus, BLM concluded at the time that "even with a considerably more optimistic projection for renewable sources, coal use continues to be projected as the largest portion of the domestic electric fuel mix until at least 2035." Supp. App. 49.

Following publication of the Final EIS and a 30-day comment period, BLM, over a period of eleven months, issued four separate records of decision for the tracts. App. 1050 (South Hilight ROD) (March 1, 2011); App. 1072 (South Porcupine ROD) (August 10, 2011); App. 1097 (North Porcupine ROD) (October 17, 2011); App. 1143 (North Hilight ROD) (February 1, 2012). The records of decision explained the reasons BLM elected to proceed with the leases. As most relevant here (though not by any means the only reasons stated for proceeding), BLM concluded, based on considerations, including duration of the mine-life extension as well as information about market dynamics available at the time, that not issuing the leases was "not likely to affect current or future domestic coal consumption used for electric generation" or "affect changes in the national electric generation portfolio." App. 1056-58. In contrast, BLM found that issuing the leases would help to reduce dependence on foreign sources of energy, provide a source of low-sulfur coal, which aids power

plants in meeting Clean Air Act requirements, and provide the United States with revenue from the leases. *Id.*

BLM considered the Plaintiffs' comment that not offering the leases would reduce greenhouse-gas emissions, and concluded that not offering the leases would be unlikely to "consequentially reduce the overall rate of national coal consumption by electric generators" because electric companies have invested heavily in existing coal-powered electric generators, and there are enough coal reserves elsewhere to meet the projected national coal demand to generate electricity. *Id.* That conclusion was based on considerations, including the duration of the mine-life extensions, as well as market dynamics, as reflected in the information available to the agency at the time. BLM therefore decided to offer the four lease tracts at issue in this case.

### C.    Procedural Background

After a round of administrative appeals that were either withdrawn or resolved in favor of BLM's decision, separate suits were filed against BLM and the Forest Service.[3] The Complaint against BLM, which is the only case on appeal, alleged that BLM had failed to comply with NEPA, raising a number of discrete objections to the NEPA analysis, App. 44-46, and also that BLM failed to comply with FLPMA by

---

[3] Because the tracts partially underlay National Forest System lands, BLM obtained the consent of the Forest Service. The Forest Service's decision to consent was challenged in a separate case in the district court, which was consolidated with this one. *WildEarth Guardians, et al., v. United States Forest Service, et al.*, No. 2:12-cv-00085. There was no appeal from the final judgment as it pertains to that case. App. 483.

failing to comply with air quality standards, App. 47-48. The district court entered judgment in favor of BLM on all claims, and this appeal followed.

## SUMMARY OF ARGUMENT

BLM thoroughly examined the environmental impacts of issuing four maintenance leases to extend the life of existing coal mines in the Powder River basin from two to six years. That review included full consideration of the greenhouse-gas emissions from burning all of the leased coal reserves for electric generation. BLM and the public were therefore fully informed of the emissions expected from the leases, and BLM made its decisions based on that information. The Plaintiffs have not argued otherwise, and instead limit their contention on appeal to the argument that BLM erred by allegedly failing to accurately quantify how *not* issuing the leases would affect the national coal market and ultimately greenhouse-gas emissions.

BLM did not ignore the consequences of not issuing the leases. BLM considered whether not issuing the leases would reduce coal consumption over the life of the leases, and concluded, based on the information available to the agency at the time, that existing coal-fired power plants would likely continue to operate to meet the predicted increasing demand for electricity over the life of these leases, and any increase in cost from substitute coal was not likely to consequentially reduce the demand for coal in that relatively short time frame. That judgment was well within BLM's expertise and was reasonable based on the information before the agency at the time.

Furthermore, predictive judgments by an expert agency acting within its area of

expertise are entitled to significant deference from this Court, and the Plaintiffs have

not demonstrated that BLM's judgment here was in error. Instead, the Plaintiffs over-

simplify the administrative record in an effort to make it seem that BLM is either

unaware of or willing to ignore basic principles of supply and demand. But this

attempt at over-simplification does not withstand scrutiny, and viewed correctly, the

administrative record fully informed and supports BLM's decision to issue these four

maintenance leases.

## STANDARD OF REVIEW

Challenges to agency actions are reviewed under the standard of the

Administrative Procedure Act, 5 U.S.C. §§ 701-706. *Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 872 (1990); *W. Watersheds Project v. BLM*, 721 F.3d 1264, 1273 (10th Cir.

2013). "A presumption of validity attaches to the agency action and the burden of

proof rests with" the plaintiff. *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677,

691 (10th Cir. 2010) (internal quotations and citations omitted).

Under the APA, a court may set aside agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or that is

not supported by "substantial evidence." *See* 5 U.S.C. § 706(2)(A), (E). This standard

of review is "narrow and a court is not to substitute its judgment for that of the

agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983);

*see also Western Watersheds Project*, 721 F.3d at 1273 (the court's inquiry "must be

thorough, but the standard of review is very deferential to the agency") (internal

quotations and citations omitted). The court "must uphold the agency's action if it has

articulated a rational basis for the decision and has considered relevant factors." *Wolfe

v. Barnhart*, 446 F.3d 1096, 1100 (10th Cir. 2006) (internal quotations and citations

omitted). The court's deference is "most pronounced in cases where, as here, the

challenged decision involves 'technical or scientific matters within the agency's area of

expertise.'" *W. Watersheds Project*, 721 F.3d at 1273, *quoting Utah Envtl. Congress v.

Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

## ARGUMENT

### I.  BLM's analysis of the comparative climate-change impacts of the action and no-action alternatives was reasonable.

In their comments to the agency, the Plaintiffs raised a litany of objections to

BLM's decision to lease these four tracts, among which was a general, less than two-

page objection to BLM's conclusion that the action and no-action alternatives would

not likely differ in their climate-change impacts. App. 725-26. BLM provided a

response to that comment in the Final EIS, Supp. App. 39-41, 48-50, and the

Plaintiffs filed a second set of comments on the Final EIS, which reiterated their

initial two-page comment, without repeating or expanding upon it, App. 1005. In the

district court, the Plaintiffs claimed many of the same violations they raised in their

comments, including arguments based on BLM's alleged failure to take a hard look at

air-quality impacts and climate change, as well as an argument that BLM failed to

consider a reasonable range of alternatives. App. 54-119. Again, only two pages was devoted to this issue in the district court opening brief. App. 112-13.

On appeal, the Plaintiffs have abandoned nearly every argument previously made, preferring to elevate what was a minor comment to the agency and argument in the district court into the entirety of their case. They contend that the BLM concluded that exactly the same amount of coal would be consumed whether or not BLM issued the leases here. Plaintiffs now call this a "perfect substitution" theory, and they say it flatly contradicts basic principles of supply and demand. If the leases were not issued, they insist, the substitute coal would cost more, so demand for the coal would go down.

The Plaintiffs ultimately contend that BLM acted arbitrarily and capriciously by assuming the same amount of more-expensive substitute coal would be consumed if it selected the no-action alternative. To the contrary, BLM analyzed and disclosed the full scope of greenhouse-gas emissions, reasonably  concluded based on considerations, including duration of the mine-life extension as well as information about market dynamics available at the time, that the demand for coal fired generation of electricity would likely be unaffected, and appropriately responded to the Plaintiffs' comments.

### A. BLM fully disclosed the expected greenhouse-gas emissions from burning all of the leased coal reserves to generate electricity.

There is no allegation in this appeal that BLM was unaware of or failed to disclose any environmental impact from the action it proposed to undertake. BLM decided to lease coal reserves to allow four existing mines to continue current levels of production for about two to six years. App. 987. BLM studied and disclosed all of the direct, indirect, and cumulative impacts of its proposed action on the environment. App. 744-1004. It provided a thorough discussion of greenhouse-gas emissions, assuming that all of the coal it proposed to lease would be burned to generate electricity, and quantified the emissions from burning that coal. App. 977-98. It provided an easy-to-read table of those quantified emissions. App. 987. BLM therefore did not "gloss over potentially significant climate impacts" of the leases, Br. 33, it thoroughly studied them, assuming the maximum possible impact. In short, BLM's disclosure of environmental impacts meets NEPA's twin aims here by ensuring that they agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts" of the proposed project, and that the public will be able to "provide input as necessary to the agency making the relevant decisions," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004).

The disclosure by BLM of the greenhouse-gas emissions attributable to the proposed action makes this case very much different than *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 549 (8th Cir. 2003), and *High Country Conservation*

*Advocates v United States Forest Service*, 52 F. Supp.3d 1174 (D. Colo. 2014), on which the Plaintiffs heavily rely. In both *Mid States* and *High Country* the agencies had completely failed to conduct that analysis or make such disclosures. *Mid States*, 345 F.3d at 550 (agency "completely ignored the effects of increased coal consumption"); *High Country*, 52 F. Supp. 3d at 1196 (agency had omitted "any estimate of [greenhouse gas] emissions associated with the combustion of coal"). In those cases, both agencies had concluded that the greenhouse-gas emissions were not attributable to the projects at issue because those emissions would occur anyway, and therefore had not studied or disclosed them. Here, BLM conducted a full and thorough analysis of the emissions from this project, and that analysis is not challenged here. Both the agency and the public were fully informed of the greenhouse-gas emissions from burning the coal from these leases. And the Plaintiffs do not challenge BLM's consideration of those quantified greenhouse-gas emissions as they relate to global climate change. NEPA therefore does not require reversal here. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

### B. BLM's discussion of the predicted coal market was reasonable.

The Plaintiffs' contention is that even though BLM and the public were fully informed of the amount of greenhouse-gas emissions this project would produce, BLM misstated the impacts of not acting, and thus skewed the choice between acting

21

and not acting. The foundation of the Plaintiffs' brief on appeal is that BLM allegedly assumed that the exact same amount of coal would be consumed whether or not BLM issued the leases when basic principles of supply and demand make that assumption unreasonable. Br. 19-39. Doing so, the Plaintiffs contend, rendered BLM's decisionmaking arbitrary or capricious.

This "perfect substitution" theory is a caricature of what BLM actually said in the administrative record. BLM determined after careful consideration, and based on the information available to the agency at the time, that demand for electricity would be the dominant driver for coal consumption over the life of these four leases—at most an extension of mining on these tracts for six years—and that an increase in cost from replacement coal was not likely to consequentially reduce that demand over that time frame. *E.g.*, App. 1057-58. The Plaintiffs want more, and contend that "BLM had an obligation to prepare a thorough study of the market impacts and how the various alternatives considered would affect overall demand for coal, natural gas, and renewable resources such as wind and solar. Further, this study should have quantified how those alternatives differed in the quantity of greenhouse gas emissions they would generate." Br. 33. The Plaintiffs' new insistence on a precise quantification of market impacts did not come up until the Plaintiffs' reply brief in the district court, and NEPA does not require the sort of fine-grained analysis to compare the no-action and action alternatives that the Plaintiffs seek. NEPA therefore provides no basis to set BLM's decision aside.

**1.    BLM did not assume "perfect substitution" or ignore basic principles of supply and demand.**

First, the Plaintiffs significantly overstate BLM's position when they claim that BLM adopted a theory of "perfect substitution" and ignored basic principles of supply and demand. Instead of blindly assuming "perfect substitution," BLM concluded, based on considerations, including duration of the mine-life extension as well as information about market dynamics available at the time, that the effect on demand from a slight increase in price for substitute coal was not likely to be "consequential" over the life of these leases and did not change its analysis or decision. In the draft and final EISs, and in the Records of Decision for each lease, BLM made no absolute statement that if it did not issue the leases there would be "perfect substitution" of coal from other sources. In fact, it made no absolute pronouncement at all, but instead recognized the many variables that could lead to different outcomes and concluded, based on the information then available to the agency, that increasing demand coupled with existing electric-generation by coal-fired power plants and sufficient supplies of replacement coal was likely to be the most important of those variables over the life of these leases. App. 982-87.

The Plaintiffs filed a comment disagreeing with the draft EIS's statement that "it is *not likely* that selection of the No Action Alternatives would result in a decrease of U.S. CO2 emissions attributable to coal-burning power plants" because there are other sources of coal to meet the projected demand. App. 725 (emphasis added). The

Plaintiffs first contended that there is not sufficient substitute coal to meet the demand, but then argued that even if there were enough substitute coal, it would be of higher cost and thus would reduce demand. App. 725-26. After considering the length of the extensions and the then-available information on market dynamics, in the Final EIS, BLM concluded that:

> It is not likely that selection of the No Action alternatives would result in a decrease of U.S. $CO_2$ emissions attributable to coal mining and coal-burning power plants in the longer term, because there are multiple other sources of coal that, while not having the cost, environmental, or safety advantages, could supply the demand for coal beyond the time that the Black Thunder, Jacobs Ranch, and North Antelope Rochelle mines complete recovery of coal in their existing leases.

App. 988. The caveats "not likely" and "could supply" are important yet completely ignored by the Plaintiffs in their attempt to paint BLM as willfully ignorant of basic principles of supply and demand.

Indeed, BLM carefully considered available projections for future nationwide coal demand when reaching its conclusion here. The final EIS discusses growth in world population and resultant increases in demand for power worldwide, including in developing countries, which rely on coal to meet these demands. App. 977-78. It notes that coal production in the United States increased nationwide by 12.9 percent between 1990 and 2006 and cites the U.S. Department of Energy's Annual Energy Outlook 2010 Report, which concludes that, in large part because of existing coal-fired plants, "even with a considerably more optimistic projection for renewable sources, coal use continues to be projected as the largest portion of the domestic

electric fuel mix." App. 983-85, 994. In addition, the final EIS notes that coal is "the

most abundant domestically available fossil fuel (USGS 2002b) . . . ."  App. 993

(adding that "one-quarter of the world's coal reserves are found within the U.S.").

Thus, coal was "forecast to remain as the major electric generation component until at

least 2035." App. 995. BLM responded directly to the Plaintiffs comments in much

the same way. Supp. App. 39-41, 48-50.

      In each record of decision, BLM provided further explanation based on the

information available at that time. As in the draft and final EIS, BLM began by noting

that "[d]enying this proposed coal leasing is not likely to affect current or future

domestic coal consumption used for electric generation" because not offering the

lease "is unlikely to affect changes in the national electric generation portfolio." App.

1057. BLM reached that conclusion by examining two studies on "the ability of the

domestic electric generation industry to alter the present portfolio (mix of electric

generation technologies) corresponding to the time period" of the leases. *Id.* Both

studies concluded that there would be growing demand for coal-powered electric

generation until 2030, and that that coal's share of the American electricity portfolio

would increase from 51 percent to 52-58 percent by 2030. Even revised projections

after the economic downturn predicted that coal-fired generation would be the largest

part of the electric-generation fuel mix at forty-four percent of the portfolio by 2035.

App. 994, 1058.

That conclusion was based on the studies' projection that electricity demand—driven by expanding population and increased reliance on electrical appliances—would continue to increase. The information available to BLM indicated that increase was likely to be met in large part by existing coal-fired electric generators, which were likely to be maintained as long as the current regulatory environment persisted. App. 1058. As BLM explained, "[u]tility companies will likely operate existing coal-burning facilities until either cost or regulatory requirements render them ineffective or they are replaced" by technologies "capable of consistently supporting the bulk electrical demands of the United States' people." *Id.* Powder River Basin coal had been replacing other domestic sources of coal because of its lower cost and safety and environmental benefits, meaning if the leases were denied many other mines outside of the basin had the capacity to replace the coal that would have been leased. Thus, the information available to BLM at the time showed increasing demand for electricity, existing coal-fired generating technology, and sufficient coal reserves elsewhere to meet the projected demand. BLM concluded, based on that information and the duration of the mine-life extension, that not issuing the leases was not likely to reduce consequentially overall coal consumption over the life of these leases. App. 1057-59.

BLM therefore responded directly to the comment submitted by the Plaintiffs contending that BLM was ignoring supply and demand and that denying the leases would reduce national coal consumption. App. 1058. BLM "thoroughly considered

this comment in [its] decision" and, for all the reasons just described, and based on the information available at that time, "disagree[d] with the comment that denying the proposed Federal coal leasing application would *consequentially* reduce the overall rate of national coal consumption by electric generators." App. 1058 (emphasis added). Instead, the "effect of rejecting the coal leasing proposed throughout the [Powder River Basin] would be that many of the existing mines would cease operations once current reserves are depleted (ranging from 7 to 15 years)." *Id.* After the reserves are depleted, BLM stated its view that "those mines would then not be able to compete with other mines to meet the future coal demand that is expected to last until at least 2035" and "their production would likely be replaced by other domestic, and, potentially, international coal producers with coal that is more costly, less environmentally compliant, and has greater residual environmental impact." *Id.*

BLM's disagreement with the Plaintiffs' comment, however, provides no basis for relief under NEPA. *Marsh*, 490 U.S. at 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive"). Because BLM was "making predictions within its area of special expertise," in particular, the national coal market, 43 C.F.R. § 3425.4(a)(1), its decision is entitled to deference. *Balt. Gas & Elec.*, 462 U.S. at 103. Thus, far from adopting an artificial "perfect substitution" theory and ignoring supply and demand, BLM considered contemporaneous information regarding the realities of the electric-

27

generation portfolio, the projected increase in demand for electricity, and the existence of other coal reserves to conclude that, over the terms of these leases, there would not be a consequential decrease in coal consumption for electricity by denying the leases.

Relying on *Mid States*, the Plaintiffs contend that even though BLM analyzed the impacts of burning the coal it proposed to lease, its failure to analyze the comparative impacts of burning that coal versus burning some lesser, undefined amount of "substitute coal" was error. But this case is far removed from *Mid States*. There, the Eighth Circuit considered a new rail line that was proposed and designed to increase the availability of lower cost coal over both the short and long term. 345 F.3d at 549. The Surface Transportation Board had entirely failed to analyze the impacts to air quality from the increase in supply the railroad would make available, contending that the increase would occur with or without the project and was not attributable to it, and therefore did not have to be studied at all. *Id.* The Court concluded that because the railroad was designed to increase the supply of cheaper coal, the proposition that it would not affect demand was "illogical at best." The Court held that "when the *nature* of the effect is reasonably foreseeable but its *extent* is not . . . the agency may not simply ignore the effect." *Id.* It therefore remanded to the agency to consider the air-quality impacts of reasonably foreseeable increases in coal consumption.

Here, BLM did not ignore the effect of its action on greenhouse-gas emissions; it assumed the maximum effect possible. BLM noted that it is not possible to accurately project the level of emissions from burning the coal from these four tracts given the uncertainties related to future emissions limits. App. 986. BLM also noted that coal mining from these tracts would not begin until about 2018 or 2019, and new technologies reducing emissions, new mitigation requirements, or an increased rate of voluntary emission reduction programs might result in significantly lower emissions than those projected in the final EIS for all alternatives. *Id.* Because of the significant uncertainty about the actual greenhouse-gas emissions expected from burning the coal in these four tracts recognized in the final EIS, it would make little sense to require BLM, as the Plaintiffs seek to do, to precisely quantify the greenhouse-gas emissions if the leases are denied. *Mid States*, which recognizes that the extent of impacts may not be reasonably foreseeable, does not require that result.

Moreover, here BLM was not considering a new rail line that would bring cheaper coal to market immediately and indefinitely, and thus far beyond the useful life of existing power plants. Instead, it was considering whether to issue "maintenance" leases to existing mines so that they can keep existing production levels until the finite amount of coal subject to the leases is mined. The leases would extend the life of the mines here as follows: the South Highlight field by 1.6 years; the North Highlight field by 2 years; the South Porcupine field by 3.3 years; and the North Porcupine field by 6.3 years. App. 987. BLM concluded, based on

considerations, including duration of the mine-life extension as well as information about market dynamics available at the time, that denying these leases was unlikely to consequentially affect demand for coal over the life of the leases. As BLM explained, "[u]tility companies will likely operate existing coal-burning facilities until either cost or regulatory requirements render them ineffective or they are replaced" by technologies "capable of consistently supporting the bulk electrical demands of the United States' people." App. 1058. Even *Mid States* recognized that demand may be unaffected in the short term because of the then-existing market advantages of coal-burning facilities. 345 F.3d at 549.

Finally, it is telling that after *Mid States*, the Surface Transportation Board ran the type model (using 2005 forecasts) that the Plaintiffs now insist the BLM should have used here and concluded that the new rail line making Powder River Basin coal more accessible would increase national and regional emissions by less than 1% and had no effect on the agency's decision. *Mayo Foundation v. Surface Transp. Bd.*, 472 F.3d 545, 555-56 (8th Circuit 2006). The Eighth Circuit had no problem affirming that analysis. *Id.* BLM's conclusion here, based on then-available information, that there was unlikely to be a consequential decrease in coal demand and resulting greenhouse-gas emissions is fully consistent with the ultimate result of the Surface Transportation Board's analysis in *Mayo Foundation* using the same tools the Plaintiffs now say BLM should have used here.

### 2.     BLM did not misread the expert reports on which it relied.

The Plaintiffs contend that BLM misread the Energy Outlook report in two ways. First, they contend BLM treated the report's projections on coal demand as "inescapable destiny." Br. 24. BLM did not treat the Energy Outlook report as destiny, and it did not need to treat it as destiny to justify its decision. BLM simply relied on the report's projections for coal demand, as it was entitled to do, and BLM was not required to recite the caveats in the Energy Outlook report before relying on it. Indeed, it is just these sorts of scientific and contingent projections within an agency's expertise that receive the most deference from the Courts. *Balt. Gas & Elec.*, 462 U.S. at 103 (when an agency "is making predictions, within its area of special expertise, at the frontiers of science ... as opposed to simple findings of fact, a reviewing court must generally be at its most deferential"); *Utah Envt'l Congress v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (noting "deference is especially strong where the challenged decision involves technical or scientific matters within the agency's area of expertise").  BLM recognized that a host of factors such as new regulatory requirements or advancements in emissions control technology could change the actual greenhouse-gas emissions. App. 986. In the records of decision, BLM also acknowledged that under a no-action alternative the cost of other sources of coal might increase, but, given the duration of the mine-life extension, as well as information about market dynamics at that time, this was unlikely to consequentially affect future energy-portfolio projections. *E.g.*, App. 1057-59.

Second, the Plaintiffs contend that BLM overlooked the report's "Market Trends" section showing that "changes in coal supply affect the price and demand for coal." Br. 25 (citing App. 581-82). That section undoubtedly predicts that coal demand may decline in response to increased coal price, and BLM has never suggested otherwise. But it also shows that price is responsive to increased demand as well. App. 581 ("Different coal price projections . . . result mainly from higher and lower projected levels of demand for coal."). Projecting which factor is likely to be more important over the time frame being considered is the essence of expert agency decisionmaking.

Other parts of the report, as well as its overall conclusion, demonstrate that demand for coal was projected to increase with demand for electricity. Thus, "trends in U.S. coal production are linked to its use for electricity generation," App. 506, and predicted "growth in population and disposable income leads to increased demand for products, services, and floor space," while shifting population "increase the need for cooling" and therefore increase electricity sales. App. 563. The 2008 report then predicted that "coal-fired powered plants . . . continue to be the dominant source of electricity generation through 2030." App. 564. In addition to existing plants, the report projected that because "coal-fired plants typically are more economical, they account for 40 percent of total capacity additions from 2006 to 2030" and "higher [overall] fuel costs in the high price case lead to more coal-fired additions" because of its cost advantages over natural gas. *Id.* Moreover, in the Southeast "new coal-fired

plants are built to accommodate growth in the electricity market and the

corresponding need for additional capacity." App. 565. In other words, the report

BLM relied on indicated that increased demand for electricity drives coal use. BLM

reasonably concluded, based on available information at that time, that persisting

demand would likely result in similar amounts of coal being burned nationwide

whether it issued the leases or not because the higher cost of replacement coal would

not consequentially reduce that demand *over the time frame being considered*.

### 3. BLM provided sufficient detail to comply with NEPA and was not required to use the models that the Plaintiffs prefer.

The Plaintiffs now contend that BLM was required to develop its own detailed

market analysis of each of the alternatives using a particular model developed by the

Department of Energy. Br. 33-34. But the Plaintiffs never mentioned that model in

their comments to the agency or suggested that BLM needed to use any model to

precisely quantify the market response to using substitute coal. App. 725-26. Instead,

the Plaintiffs' comments were general in nature, noting that higher coal prices would

make other fuel sources more attractive, and asserting that the agency "has not

adequately analyze[d] and assessed the potential global warming impacts" of the

action and no-action alternatives. The model that the Plaintiffs now insist BLM was

required to use was not mentioned by them until their Reply Brief in the district court.

App. 382. As the Supreme Court and this Court have repeatedly made clear, parties

must "structure their participation so that it is meaningful" especially when

"requesting the agency to embark upon an exploration of unchartered territory." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978); *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 783 (10th Cir. 2006).

In *Mid States*, for example, the plaintiffs had brought the models to the agency's attention during the NEPA process. 345 F.3d at 550 (noting that Plaintiffs had "identified computer models that are widely used in the electric power industry" as part of comments on the draft EIS). Here, though, the Plaintiffs submitted a general comment suggesting that increased coal cost would decrease demand if these leases were not issued, and the agency responded to the comment in like manner relying on studies in the record that demonstrated demand for coal was likely to remain for the life of these leases. The Plaintiffs cannot now contend that BLM was required to use a particular model to generate a precise quantification of the market impacts of higher-cost substitute coal when they never requested the agency to use that model during the administrative process.[4]

---

[4] Amici are in an even worse position to insist on the use of particular economic models, as they did not participate before the agency at all, and none of the models or analysis by other agencies that amici rely on was put before BLM during the administrative process. Those materials are therefore not part of the administrative record that was before BLM and are not properly considered by this Court in review of a decision based on that record. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir.1994). And amici's attempt at the end of the brief (Am. Br. at 30) to introduce an entirely new issue into this case must also be rejected. *Wyoming Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1230 n.2 (10th Cir. 2000), citing *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403–04 (10th Cir.1997) (court of appeals should exercise discretion to consider new issues and arguments advanced by amicus only in exceptional circumstances).

Regardless, BLM was not required use any particular model or to precisely quantify market impacts like the Plaintiffs now insist. BLM's conclusions, based on the reports it examined, were that increased electricity demand would be the dominant driver of coal consumption for the life of the leases. BLM was under no obligation to analyze or discuss the issue in more detail. As just explained, BLM thoroughly examined expert predictions on the future demand for coal, considered the Plaintiffs' comments that not issuing the leases would impact that demand, and concluded that the impact was not likely to be consequential given the other drivers of demand reflected in the available information on market dynamics, as well as the duration of the mine-life extension, and therefore did not require further study. Those sorts of predictions are well within the agency's expertise on the coal market, 43 C.F.R. § 3425.4(a)(1) (requiring BLM to make "fair market value" determinations before leasing coal), and are entitled to significant deference from this Court. *Balt. Gas & Elec.*, 462 U.S. at 103 (agency "making predictions within its area of special expertise" entitled to deference); *Marsh*,  490 U.S. at 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive").

BLM receives deference not just for its substantive decisionmaking, but also for its choice of studies to inform its analysis and how much detail to include about any particular issue in the EIS. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th

Cir. 2008) (expert agencies are entitled to deference "not only when reviewing

decisions like what evidence to find credible . . . but also when reviewing drafting

decisions like how much discussion to include on each topic, and how much data is

necessary to fully address each issue"); *Utahns for Better Transp. v. U.S. Dep't of Transp.*,

305 F.3d 1152, 1166 (10th Cir. 2002) *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003)

(noting rule of reason "applies both to which alternatives the agency discusses and the

extent to which it discusses them").

The Plaintiffs fault BLM for not using tools "necessary to conduct a robust

market analysis," Br. At 21, but then readily admit that BLM's analysis was based on

"EIA's 2008 Annual Energy Outlook Report, which is itself *based on precisely that type of*

*market analysis*," Br. 21 (emphasis added). BLM was entitled to rely on a report using

the type of market analysis the Plaintiffs seek to identify and predict national trends in

the coal market rather than develop its own narrower market analysis using the same

tools to quantify the impact of differences in coal prices for the life of the leases.

*Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1270 (10th Cir. 2014)

("NEPA does not require the agency to use particular methodologies."). And BLM

reasonably determined, based on that report, that demand would drive coal

consumption over the life of these leases, and that the Plaintiffs' concerns would not

consequentially reduce that demand. The level of detail on the persisting demand for

coal in the final EIS, and the response to the Plaintiffs' comments in the records of

decision, are entirely adequate.

Furthermore, in *Mid States* the Eighth Circuit did not demand any particular level of specificity on the *extent* of the impact from the project on demand for coal, but instead held that the agency must consider the impact when its *nature* is reasonably foreseeable. Thus, the Plaintiffs go far beyond *Mid States* and NEPA's aims when they insist that BLM must precisely quantify how a decision not to issue the leases would impact the market for coal, then precisely quantify how the market impacts would affect greenhouse-gas emissions, and then weigh the projected greenhouse-gas emissions against each other. Br. 33. As this Court has held, NEPA "is governed by a 'rule of reason.'" *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004). Thus, while it is "always possible to explore a subject more deeply and to discuss it more thoroughly," *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987), it remains true that "the line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Id.* "NEPA does not require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors." *Forest Guardians v. United States Forest Service*, 495 F.3d 1162, 1172 (10th Cir.2007). BLM engaged in that line drawing here, and its decision that more detailed information was unnecessary was a reasonable evaluation of the relevant factors. The district court's judgment should be affirmed.[5]

---

[5] The Final EIS in this case was finalized in 2010, and the Records of Decision were signed in 2011 and 2012. As we have explained, BLM's analysis and decision, based on the science and market conditions reflected in the record before BLM, complied

## II.    Even if BLM's analysis of the no-action alternative was erroneous, any error was harmless under NEPA.

The APA provides that agency actions should be set aside if arbitrary or capricious, but makes clear that in conducting that review "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2). The Supreme Court has interpreted that phrase to adopt the general harmless error standard from civil cases when courts are reviewing agency action. *Shinseki v. Sanders*, 556 U.S. 396, 406-407 (2009). "Deficiencies in an EIS that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009). "Thus, even if an agency violates the APA, its error does not require reversal unless a plaintiff demonstrates prejudice resulting from the error." *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012). Importantly, "[a] presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *New Mexico ex rel. Richardson*, 565 F.3d

with NEPA. As noted above, BLM announced that it intends to prepare a Programmatic EIS to review the Federal coal program. 81. Fed. Reg. 17720 (March 30, 2016). As part of its comprehensive review of the Federal coal program, the Programmatic EIS is expected to "examine how best to measure and assess the climate impacts of continued Federal coal production, transportation, and combustion" and that examination "will include evaluation of potential substitution effects from any changes in Federal coal production." 81 Fed. Reg. at 17725.  Again, this review intends to programmatically assess environmental impacts using the best available data and analysis, including consideration of coal market impacts, and will serve as a basis for future lease-specific analysis.

at 704. As the Fifth Circuit explained, prejudicial error may be found only "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." *U.S. Steel Corp. v. E.P.A.*, 595 F.2d 207, 215 (5th Cir.1979).

This Court has found agency mistakes in defining the impacts of the no-action alternative and then comparing to the proposed alternative to be harmless. In *Prairie Band Pottawatomie Nation*, this Court concluded that the Federal Highway Administration's error in failing to adequately compare existing noise levels and predicted noise levels from a new highway project was harmless because it "would not have affected this relative comparison of the alternatives." 684 F.3d 1009-10. *Id.*

Here, any errors suggested by Plaintiff in the details of quantification of predicted coal combustion under the no-action alternative would not have been significant enough to affect the BLM's decision to issue the leases. General levels of expected greenhouse-gas emissions and "many other factors" were an important part of BLM's decisionmaking. App. 1059-61. Where BLM was fully informed of the general amount of greenhouse gas emissions expected from the leases, and many other factors weighed in favor of granting the leases, the Plaintiffs have not

demonstrated any error that would have affected the decision. The district court should therefore be affirmed.[6]

## CONCLUSION

The district court's judgment should be affirmed.

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that oral argument will assist this Court in reviewing the administrative record and deciding this appeal.

Respectfully submitted,

*of Counsel*
PHILIP C. LOWE
U.S. Department of the Interior
Rocky Mountain Regional Solicitor's
Office

JOHN C. CRUDEN
    *Assistant Attorney General*

s/*Michael T. Gray*
JOHN S. MOST
ANDREW C. MERGEN

---

[6] If this Court disagrees, it should simply reverse and remand to the district court with instructions to remand to BLM. The Plaintiffs have not asked for, and this Court should not grant, either vacatur of the leases or injunctive relief. Vacatur and injunctions are equitable remedies, *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) ("It goes without saying that an injunction is an equitable remedy."); *Bancorp. Mortg. Co. v. Bonner Mall Partnership*, 513 U.S. 18, 26 (1994) (vacatur equitable remedy), and equitable relief is never mandatory, *Bonner Mall,* 513 U.S. at 26 (noting that "[a]s always when federal courts contemplate equitable relief" courts must "take account of the public interest"). Instead, equitable relief, must be tailored to the particular final agency action and parties before the court and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see United States DoD v. Meinhold*, 510 U.S. 939 (1993) (granting stay of Armed-Forces-wide injunction, except as to individual plaintiff). Here, the district court has not weighed the equities, and this Court should not do so in the first instance. *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1291 (11th Cir. 2015).

MICHAEL T. GRAY
*Attorney, Appellate Section*
*Environment and Natural Resources Div.*
*U.S. Department of Justice*
*701 San Marco Blvd.*
*Jacksonville, FL 32207*
*(202) 532-3147*
*michael.gray2@usdoj.gov*

APRIL 2016
90-1-4-13584

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App.

P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a

proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed.

R. App. P. 32(a)(7)(B) because it contains **10,411 words**, excluding the parts of the

brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


　　　　　　　　　　　s/ *Michael T. Gray*
　　　　　　　　　　　MICHAEL T. GRAY

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that:

• There is no information in this Brief subject to the privacy redaction requirements of 10th Cir. R. 25.5; and

• The hard copy of this Brief to be submitted to the Court is an exact copy of the version submitted electronically; and

• This brief was scanned with System Center Endpoint Protection, version 1.217.390.0, updated April 1, 2016, and according to the program the Supplemental Appendix is free of viruses.

DATE: April 4, 2016                    *s/ Michael T. Gray*
                                         MICHAEL T. GRAY

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2016, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ *Michael T. Gray*
MICHAEL T. GRAY