# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

Case No. 15-8109

WILDEARTH GUARDIANS, et al.,

Petitioners - Appellants,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT,

Respondent - Appellee,

and

WYOMING MINING ASSOCIATION, et al.,

Intervenors - Appellees,

-------------------------------

STATE OF WYOMING, et al.,

Respondents – Intervenors

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF WYOMING (Case No. 2:13-cv-00042-ABJ)
(JUDGE ALAN B. JOHNSON)

*Oral Argument is Requested*

## PETITIONERS-APPELLANTS' REPLY BRIEF

Nathaniel Shoaff
Nathan Matthews
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5610
nathaniel.shoaff@sierraclub.org
nathan.matthews@sierraclub.org

Samantha Ruscavage-Barz
WildEarth Guardians
516 Alto St.
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*Attorneys for Petitioners-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

GLOSSARY ...................................................................................................v

INTRODUCTION ...........................................................................................1

ARGUMENT ..................................................................................................4

I.   BLM Violated NEPA by Arbitrarily Concluding That Its Decision to
     Authorize the Two Billion Ton Wright Area Coal Leases Would Not
     Likely Have Any Consequential Effect on Coal Consumption or
     Carbon Dioxide Emissions. ................................................................4

   A.   The Evidence Upon Which BLM Primarily Relied – EIA's Annual
        Outlook Report – Explicitly Contradicts BLM's Statements in the
        Record and the Post-Hoc Rationalizations of Counsel. ..................5

   B.   BLM's Attempt to Hedge Its "Perfect Substitution" Theory by Noting
        the EIS Concluded the Leases Are "Not Likely" to Have a
        "Consequential" Effect on Climate (As Opposed to No Effect) Does
        Not Excuse BLM's Failure to Take a Hard Look at Climate Impacts........11

   C.   BLM's Disclosure of Greenhouse Gas Emissions That It Claims Are
        Not Attributable to the Project Does Not Excuse Its Failure to Examine
        the Effects of Its Decision on Coal Consumption. .....................................12

   D.   Conservation Organizations Adequately Raised BLM's Failure to
        Study the Market Effects of Its Decision During the Administrative
        Proceedings, and BLM Violated NEPA By Failing To Use
        Available   Tools to Do So. ........................................................15

II.  BLM's Arbitrary Conclusion that Its Decision to Authorize the
     Wright Area Leases Would Have No Effect on the Climate Is Not
     Harmless Error.......................................................................19

III. Conservation Organizations Meet Article III Standing Requirements. .........22

i

A.  Conservation Organizations Have Established Article III Standing by Demonstrating Injury, Causation, and Redressability.................................23

B.  Conservation Organizations Presented the Same Standing Theory in District Court. ..............................................................................................25

IV.  The Appropriate Remedy Is Vacatur of the Leases and Injunctive Relief. ................................................................................27

CONCLUSION ........................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .......................................30

CERTIFICATE OF SERVICE .................................................................31

CERTIFICATE OF DIGITAL SUBMISSION .........................................................33

## TABLE OF AUTHORITIES

**Cases**

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) .................11

*Catron Cty. Bd. Of Comm'rs v. U.S. Fish & Wildlife Serv.*,
   75 F.3d 1429 (10th Cir. 1996) ...............................................................21

*Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996) ...................23

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................... 24, 25

*Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002).......................................28

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59 (1978)..............24

*Hicks v. Gates Rubber Co.*, 928 F.2d 966 (10th Cir. 1991)....................................20

*High Country Conservation Advoc. v. U.S. Forest Serv.*,
   52 F.Supp.3d 1174 (D. Colo. 2014)................................................. 13, 14, 15, 23

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
   67 F.Supp.3d 1262 (D. Colo. 2014).....................................................28

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................23

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ......................................................... 13, 14

*N.R.D.C. v. Daley*, 209 F.3d 747 (D.C. Cir. 2005)....................................................9

*N.R.D.C. v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005) ............................. 5, 21

*Nat'l Parks & Conservation Ass'n v. B.L.M.*, 606 F.3d 1058 (9th Cir. 2010) ........16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   422 F.3d 782 (9th Cir. 2005) ................................................................7

*New Mexico ex rel. Richardson v. BLM*,
   565 F.3d 683 (10th Cir. 2009) ............................................................. 5, 8, 12, 13

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) ..................6

*Oregon Nat. Desert Ass'n v. B.L.M.*, 625 F.3d 1092 (9th Cir. 2008).......................18

*Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*,
  684 F.3d 1002 (10th Cir. 2012) ...........................................................21

*Sierra Club v. Marita*, 46 F.3d 606 (7th Cir. 1995)..................................11

*Sierra Club v. Salazar*, No. 10-1513 (RBW),
  2016 WL 1436645 (D.D.C. Apr. 11, 2016).........................................7

*Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256 (10th Cir. 2002)...................23

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
  433 F.3d 772 (10th Cir. 2006) ............................................................20

*Steamboaters v. F.E.R.C.*, 759 F.2d 1382 (9th Cir. 1985)......................................19

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................24

*Unbelievable, Inc. v. N.L.R.B.*, 118 F.3d 795 (D.C. Cir. 1997)..............................10

*Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519 (1978) .............16

*WildEarth Guardians v. B.L.M.*, 8 F.Supp.3d 17 (D.D.C. 2014) ...........................23

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) .............................23

*WildEarth Guardians v. U.S. Forest Serv.*,
  828 F.Supp.2d 1223 (D.Colo. 2011)...................................................23

**Statutes**

5 U.S.C. § 706(2)(A)....................................................................................28

42 U.S.C. § 4332(2)(C)..................................................................................4

**Regulations**

40 C.F.R. § 1500.3 ............................................................................... 20, 22

40 C.F.R. § 1502.14 ....................................................................................20

40 C.F.R. § 1502.22(b) ...........................................................................................19

40 C.F.R. § 1502.5 .................................................................................................28

## GLOSSARY

| BLM | Bureau of Land Management |
| EIA | Energy Information Administration |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| GHG | Greenhouse Gas |
| NEPA | National Environmental Policy Act |
| NEMS | National Energy Modeling System |
| PRB | Powder River Basin |
| ROD | Record of Decision |

## INTRODUCTION

In authorizing the four Wright Area coal leases, the Bureau of Land Management ("BLM") made available an unprecedented two billion tons of low-cost federal coal.  In some years these leases could produce more than twenty percent of coal in the U.S. market.  Although BLM's Environmental Impact Statement ("EIS") for the leases acknowledged that nearly all this coal will be burned in coal-fired power plants and that burning coal releases carbon dioxide that contributes to a warming planet and myriad harmful effects of climate change, the EIS nevertheless concluded that authorizing these leases would have no effect on the climate.  The EIS based its conclusion on a discredited theory that if BLM were to reject the proposed leases in favor of the No Action alternative, an equivalent amount of 'substitute' coal would be mined from someplace else, and thus the total amount of coal mined and burned and the amount of carbon dioxide emitted would be the same whether BLM approved or rejected the Wright Area leases.  Specifically, the EIS concluded – without supporting evidence or analysis – that the same amount of greenhouse gases would be emitted regardless of whether the two billion tons of coal at issue are mined or left in the ground, and that authorizing the leases therefore is not likely to have any consequential effect on the climate.

Courts have rejected this nonsensical perfect substitution assumption twice in closely analogous situations, recognizing that agency decisions that increase coal supply will affect the amount of coal consumed and the mix of technologies used to supply electricity.  Under the National Environmental Policy Act ("NEPA"), federal agencies must disclose these reasonably foreseeable effects to the public and decisionmakers before charging ahead.  Here, BLM's perfect substitution assumption directly contradicts record evidence provided by the Energy Information Administration ("EIA"), which explains that changes in coal supply and coal price will affect coal demand and evens models the extent of these anticipated changes in coal use in response to specific changes in coal price.  While BLM admits that substitute coal would cost more than the Wright area coal and that this higher cost would affect demand, the agency nevertheless arbitrarily concluded – without employing the EIA model and without providing any explanation why it ignored the model – that the higher price of substitute coal would not have any consequential effect on market demand.  BLM made no attempt to reconcile its perfect substitution assumption with the EIA report, and that unsubstantiated assumption was the basis for the EIS's irrational conclusion that leasing two billion tons of coal would have no effect on the climate as compared with leaving that coal in the ground.  BLM's failure to accurately disclose the difference in climate pollution between leaving this massive amount of

coal in the ground and allowing it to reach the U.S. market violated NEPA by depriving the public and the decisionmakers of key information essential to understanding the environmental effects of the proposed action compared with the No Action alternative.

BLM tries to justify its decision by arguing that the EIS did not completely rule out the potential for climate impacts and that its analysis was based on then-available information.  But hedge words do not justify BLM's utter failure to take a "hard look" at the issue, as NEPA requires.  BLM also ignored EIA's model, as well as various other models available at the time, which would have enabled the agency to determine the market effects of its leasing decision.  Ultimately BLM misled the public and decisionmakers by impermissibly skewing the consideration of alternatives – an error at the heart of the EIS process that cannot be dismissed as trivial or "harmless."  BLM's decision to authorize the leases based on a deficient EIS was therefore arbitrary and capricious, and must be set aside.

Finally, Defendant-Intervenors alone argue that Conservation Organizations did not establish standing or administratively exhaust the issue presented on appeal. To the contrary, the District Court correctly determined that Conservation Organizations have standing, and the issue on appeal was clearly presented in the Organizations' administrative comments.

## ARGUMENT

I.    **BLM Violated NEPA by Arbitrarily Concluding That Its Decision to Authorize the Two Billion Ton Wright Area Coal Leases Would Not Likely Have Any Consequential Effect on Coal Consumption or Carbon Dioxide Emissions.**

BLM violated NEPA by failing to take the required hard look at the climate impacts of its decision to authorize the Wright Area leases, which are among the largest ever approved by the agency.  App. 717; *see* 42 U.S.C. § 4332(2)(C).  BLM's EIS, and the Record of Decision ("ROD") for each of these leases, assured decisionmakers and the public that BLM's decision was unlikely to change the amount of coal mined, coal burned, or carbon dioxide emitted into the atmosphere.  But BLM's assertion – that if it were to reject the leases in favor of the No Action alternative, other sources of coal would completely substitute for the Wright Area coal, fully replacing it in the U.S. market despite the substitute coal's  higher costs – is flatly contradicted by record evidence.

In its response brief, BLM continues to cherry-pick information from the EIA Report, ignoring crucial information about the effects that changes in coal supply and price have on coal use anytime those statements undercut BLM's perfect substitution theory.  But these post-hoc rationalizations of counsel cannot paper over the fact that there is no evidence or analysis in the record that supports BLM's conclusion that its decision to authorize these leases was "not likely" to have any "consequential" effect on greenhouse gas emissions.  Moreover, the fact

4

that BLM refused to use any of the market models that other agencies had used for

years to analyze the impacts of their decisions belies BLM's repeated claim that its

decision was based on information available at the time. "NEPA does not permit

an agency to remain oblivious to differing environmental impacts, or hide these

from the public." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 707 (10th

Cir. 2009). Under NEPA, agencies must "present *complete and accurate*

*information* to decision makers and the public to allow an informed comparison of

the alternatives." *N.R.D.C. v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005)

(emphasis added). Here BLM violated NEPA by failing to take the hard look at

the climate impacts of its lease authorizations that NEPA requires.

### A. The Evidence Upon Which BLM Primarily Relied – EIA's Annual Outlook Report – Explicitly Contradicts BLM's Statements in the Record and the Post-Hoc Rationalizations of Counsel.

The record contains only a single study addressing the effect of coal supply

and price on coal consumption: the EIA's Annual Energy Outlook Report.[1] BLM

observes that EIA predicts national electricity demand and the amount of coal

consumed to generate electricity will increase through 2030. BLM Br. at 32; App.

678. Conservation Organizations do not challenge EIA's energy forecasts, but

rather the leap that BLM made between EIA's general predictions and BLM's

---

[1] BLM states that it relied on two studies, but neither names nor cites them. BLM Br. at 25. As addressed in district court briefing, the other document appears to be a power point presentation that does not address this issue and is not in the record. *See* App. 377.

assertion that other coal supplies would completely replace Wright Area coal in the market if BLM were to select the No Action alternative.  While EIA acknowledges the role that overall electricity demand has on coal use, BLM ignored the fact that EIA also highlights the central role that the cost of coal plays in determining the amount of coal used: "U.S. coal production is projected to increase from 2006 to 2030; *however, different assumptions* about economic growth (which mainly affect overall electricity demand) and *about the costs of producing fossil fuels (which primarily determine the mix of supply sources for generation and petroleum products) lead to different results.*"  App. 580 (emphasis added);  *see* App. 581 (explaining EIA's modeling shows that "high coal cost[s]" would "result" in a "switch from coal to natural gas, nuclear, and renewables in the electricity sector.").  BLM never reconciled its perfect substitution theory with this directly contradictory information from the very report on which it relied; and by ignoring relevant factors, without explanation, in reaching its ultimate conclusion, BLM failed to take the "hard look" NEPA requires.  "Isolated bits of evidence, taken out of context and overwhelmed by other evidence, will not support an affirmance of agency action."  *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1578 (10th Cir. 1994).

Nowhere in the record did BLM acknowledge EIA's specific conclusions (and modeling) on the impact that changes in coal price have on coal demand, nor

6

even the general relationship between price and demand. "The deference accorded an agency's scientific or technical expertise is not unlimited. Deference is not owed when the agency has completely failed to address some factor, consideration of which was essential to making an informed decision." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 799 (9th Cir. 2005). BLM now attempts to justify its failure to grapple with those factors by claiming it is "not required to recite the caveats" in EIA's Report. BLM Br. at 31. However, NEPA does not allow BLM to ignore crucial information and cherry-pick the pieces it likes, while shielding the public from EIA findings that significantly undercut BLM's position. "[F]rom the same discrete source, the [agency] cites (allegedly) favorable evidence and disregards unfavorable evidence. Such cherry-picking embodies arbitrary and capricious conduct." *Sierra Club v. Salazar*, No. 10-1513 (RBW), 2016 WL 1436645, at *22 (D.D.C. Apr. 11, 2016). Nor did BLM provide any basis for concluding that, although price may influence demand in a general sense, the particular price increases that would result from denial of the Wright Area leases would not meaningfully affect coal demand. Although BLM repeatedly acknowledged that available substitutes for Wright Area coal would be more expensive, App. at 983, 988, 1059, 1082, 1107, 1153; BLM Br. at 16, 22-24, 26, 31, 33, the EIS and RODs provided no analysis of relevant factors such as how much more expensive these substitutes were, the amount of substitute coal

7

available at various prices, or the effect of denying the leases on overall U.S. coal prices.

On appeal, BLM argues, for the first time, that it determined that rejecting the Wright Area leases (*i.e.*, taking 230 million tons of coal in some years off the market, an amount equivalent to more than twenty percent of U.S. coal supply) would cause only "slight" coal price increases. BLM Br. at 23. This statement is made without citation and is unsupported by any analysis in the record. "In considering whether the agency took a 'hard look,' we consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs or argument." *New Mexico*, 565 F.3d at 704. Even now, BLM provides no indication as to what it contends these increases would be, or the basis for BLM's characterization of the increases as negligible.

While BLM asks for unbridled deference, BLM Br. at 27, here there is simply no analysis in the record and thus no exercise of BLM's asserted expertise for this Court to defer to. There is no evidence that BLM has *ever* conducted the type of analysis that would be useful to decisionmakers here.[2] Agencies "cannot

---

[2] BLM asks for deference based on its obligation to recover "fair market value" when it sells coal. BLM Br. at 35. But determining the price at which to sell coal is fundamentally different than determining the market's response to a particular leasing decision. BLM tries to excuse its failure to undertake a market analysis by claiming that this is an area that "continues to evolve" and that it plans to do so in the future. BLM Br. at 4-5 n.2. BLM fails to explain why it did not use the tools that are currently available or why its conclusions contradict basic economic principles of supply and demand. Op. Br. at 31-32.

rely on reminders that its scientific determinations are entitled to deference in the absence of reasoned analysis." *N.R.D.C. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2005) (citation omitted). As noted above, BLM provided no discussion of the extent of expected changes in coal prices and no explanation as to why the potentially massive changes in coal supply at issue here would not produce results in line with EIA's findings.

BLM puts great emphasis on the "duration of the mine-life extension" of the leases, BLM Br. 35,[3] yet here again BLM failed to provide any analysis and ignored directly contradictory information from EIA on how the market will respond. BLM argues that its conclusion regarding effects on coal combustion rests on examination of "'the ability of the domestic electric generation industry to alter the present portfolio (mix of electric generation technologies) corresponding to the time period' of the leases." BLM Br. at 25 (quoting App. 1057). BLM has not exercised any of its asserted expertise regarding the "electric generation industry" and its ability and willingness to "alter" its "portfolio" in response to changes in coal prices. *See Unbelievable, Inc. v. N.L.R.B.*, 118 F.3d 795, 805

---

[3] While BLM claims that its decision would "allow four existing mines to continue current levels of production for about two to six years"), BLM Br. at 20 (citing App. 987), the record indicates otherwise. There are two mines at issue in this case, Black Thunder (expanded by the North and South Hilight leases) and North Antelope Rochelle (expanded by the North and South Porcupine leases). BLM's Preferred Alternative is Alternative 2, App. 774, and the chart on App. 987 indicates that Alternative 2 extends the life of the North Antelope Rochelle Mine by 11.4 years (7.8 years by North Porcupine and 3.6 by South Porcupine) and Black Thunder Mine by 7.1 years (4.8 years by North Hilight and 2.3 by South Hilight).

(D.C. Cir. 1997) ("court does not defer to agency decision in matter outside of agency's expertise.").  EIA explains that changes in fossil fuel prices can change the amount that existing power plants are utilized, even without altering the number of coal-fired power plants that get built, because utilities and electricity providers "can choose among different fuels on an ongoing basis," and can "quickly" switch between coal and natural gas.  App. 569-70.  As noted, EIA states that increases in coal price will reduce the amount of coal used, and EIA even models the expected changes in coal use based on specific changes in coal price.  App. 580-81.

Here, BLM concluded that all two billion tons of the Wright Area coal would simply substitute for other sources without affecting coal demand or consumption, and it based this conclusion almost entirely on EIA's forecast for coal use through 2030.  BLM's Br. at 32.  But BLM ignored EIA's conclusion that increases in coal price will reduce coal consumption.  App. 580-81.  And while BLM acknowledged that substitute coal would cost more, *e.g.*, App. 983, 1059, it cannot point to any record evidence to support its assertion that the effects on coal price and coal use here would be inconsequential.  Instead, BLM asks for deference in its reading of EIA's report, despite the fact that BLM's conclusions clearly contradict EIA's analysis of the influence that coal prices have on coal consumption.  But "deference does not mean obeisance," *Sierra Club v. Marita*, 46

10

F.3d 606, 619 (7th Cir. 1995), and "there is no APA precedent allowing an agency
to cherry-pick a study on which it has chosen to rely." *Am. Radio Relay League,
Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

>    **B. BLM's Attempt to Hedge Its "Perfect Substitution" Theory by
>    Noting the EIS Concluded the Leases Are "Not Likely" to Have a
>    "Consequential" Effect on Climate (As Opposed to No Effect) Does
>    Not Excuse BLM's Failure to Take a Hard Look at Climate Impacts.**

BLM now tacitly admits that an agency decision rejecting the leases would
reduce domestic coal use, but BLM contends that the reduction is "not likely to be
'consequential.'" BLM Br. at 23.  "Not likely" to be "consequential" is a mantra
BLM repeats throughout its brief,[4] but BLM fails to explain how it arrived at the
conclusion because it does not cite any record analysis of the extent of the potential
coal combustion reduction, or the resulting change in carbon dioxide emissions.
Hence, the mere fact that the EIS in this case used hedge words is a distinction
without a difference.  Without any discussion of the extent to which authorizing
the leases might affect coal price and consumption, and without any discussion of
what those effects would be if they were to occur, the record reveals these hedge

---

[4] BLM recites its "consequentially" modifier on a dozen pages, each time citing App. 1056-59 or
App. 987. BLM Br. at 15, 16, 22, 23, 26, 27, 28, 30, 31, 33, 35, 36.  Only App. 1058 actually
contains the word "consequentially." BLM references its "not likely" language at least eight
times, each citing the same two record spans noted above, App. 1056-59 or App. 988. BLM Br.
at 14, 16, 22, 23, 24, 25, 26, 35. "Not likely" is only used on pages 988 and 1057; in both cases,
the record states that the denying the leases is "not likely to affect" or "decrease" emissions,
without any qualifier such as "consequentially."

words are part of an "unanalyzed, conclusory assertion" which this Court should reject. *New Mexico*, 565 F.3d at 708.

BLM's assertion that its qualifiers somehow reveal that it was not relying on a perfect substitution theory is further undermined by the fact that BLM fully embraced and defended perfect substitution before the District Court. In its brief below, BLM asserted:

> [Plaintiffs] argue that BLM should have considered a scenario in which this raised cost would lead to a decreased demand for and use of coal. BLM does not share this view. It reasonably concluded that other sources of coal *would replace* Wright Area coal, should the proposed leases be rejected.

App. 307 (emphasis added). BLM also asserted that its "assumption was reasonable." App. 306. On appeal, BLM suddenly reverses course and now claims that it did *not* assume perfect substitution. BLM Br. at 22-23. However, BLM fails to point to any record evidence to support its new position, and instead merely emphasizes that the EIS used hedge words. BLM's shifting litigation position only further underscores the weakness of its position.

### C. BLM's Disclosure of Greenhouse Gas Emissions That It Claims Are Not Attributable to the Project Does Not Excuse Its Failure to Examine the Effects of Its Decision on Coal Consumption.

While BLM correctly notes that the EIS fully disclosed the expected greenhouse gas emissions from burning all of the leased coal reserves to generate electricity, such disclosure does not amount to the "hard look" that NEPA requires.

12

BLM violated NEPA not by failing to disclose the amount of greenhouse gases that would be emitted by burning two billion tons of coal, but rather by irrationally concluding without any supporting analysis that those effects are not attributable to its decision to authorize the leases. The issue on appeal is whether BLM provided "information sufficient to permit a reasoned choice" between issuing the leases and adopting the No Action alternative. *New Mexico*, 565 F.3d at 708. While BLM claims that the EIS assumed the "maximum possible impact" and "maximum effect possible" of issuing the leases, BLM Br. at 20, 29, it is hard to reconcile that contention with the EIS's conclusion that the authorizing the leases would have essentially *no effect* on the climate. Specifically, the EIS concluded "[i]t is not likely that selection of the No Action alternatives would result in a decrease of U.S. $CO_2$ emissions attributable to coal mining and coal-burning." App. 988. According to the EIS, the same amount of coal likely will be burned regardless of whether the two billion tons of coal at issue here are mined or left in the ground, and therefore the decision to authorize the leases will have no consequential effect on the climate. *Id.* This "perfect substitution" theory has been rejected by the courts that have addressed the issue. *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548-49 (8th Cir. 2003); *High Country Conservation Advoc. v. U.S. Forest Serv.*, 52 F.Supp.3d 1174, 1197-98 (D. Colo. 2014); *see* Op. Br. at 28-32.

BLM attempts to distinguish these decisions on the grounds that the agencies in those cases had not quantified combustion-related emissions, BLM Br. at 20-21, but the agencies' fundamental error in both cases was the same as BLM's here: a record devoid of any evidence to support the agencies' ultimate conclusion that the agencies' decisions would have no effect on the climate. *Mid States*, 345 F.3d at 549; *High Country*, 52 F.Supp.3d at 1197. Here, while BLM disclosed the amount of greenhouse gases that would be emitted if two billion tons of coal were burned, it irrationally concluded with no supporting analysis that those effects were not attributable to its decision to authorize the leases. Like in *Mid States* and *High Country*, BLM violated NEPA because it failed to identify any record evidence supporting its conclusion that its project would not significantly affect coal production or carbon dioxide emissions.

The *High Country* decision, which BLM barely mentions, is particularly relevant because the Forest Service—like BLM here—based its perfect substitution assumption "on a U.S. Department of Energy[5] report forecasting a small annual increase in the demand for coal." 52 F.Supp.3d at 1197. Thus, both agencies made decisions that allowed coal mining on public lands; both agencies asserted their decisions would have no impact on the total amount of coal mined; and both agencies based their assertions on an EIA report generally forecasting a small

---

[5] EIA is part of the Department of Energy. App. 491.

increase in coal demand.  *Id.*  The *High Country* court, like the Eighth Circuit in

*Mid States*, properly concluded that "this additional supply will impact the demand

for coal relative to other fuel sources, and coal that otherwise would have been left

in the ground will be burned.  This reasonably foreseeable effect must be

analyzed."  *Id.* at 1198.

> ### D. Conservation Organizations Adequately Raised BLM's Failure to Study the Market Effects of Its Decision During the Administrative Proceedings, and BLM Violated NEPA By Failing To Use Available Tools to Do So.

This Court should reject the arguments by BLM and Intervenor State of

Wyoming that Conservation Organizations failed to sufficiently raise BLM's lack

of market analysis during the public comment process because they did not name

the specific energy market models that the agency could have used.  BLM Br. at

33; Wyo. Br. at 27.  Neither BLM nor Wyoming suggests BLM was unaware of

these models, which had been used for many years by other federal agencies and

one of which was used to create the EIA study BLM relied on; neither suggests

that Conservation Organizations' comments failed to put the matter before the

agency with enough clarity for BLM to understand the issue; and neither offer any

authority requiring Conservation Organizations to name the specific energy models

that were available to BLM at the time.

Conservation Organizations argue here, as they did during the public

comment period, that BLM failed to adequately study the market and climate

15

impacts of its decision to authorize more than two billion tons of coal leasing.

NEPA plaintiffs "must bring sufficient attention to an issue to stimulate the

agency's attention and consideration of the issue" during public comment.

*Vermont Yankee Nuclear Power Corp. v. N.R.D.C.*, 435 U.S. 519, 550 (1978).

"Plaintiffs need not state their claims in precise legal terms, and need only raise an

issue with sufficient clarity to allow the decision maker to understand and rule on

the issue raised . . . ." *Nat'l Parks & Conservation Ass'n v. B.L.M.*, 606 F.3d 1058,

1065 (9th Cir. 2010) (quotation omitted).  Conservation Organizations did just that,

stating, "[t]he DEIS incorrectly claims the no action and action alternatives will not

differ in their climate change impacts."  App. 725.  Conservation Organizations

noted that Wright Area coal is less expensive than substitute coal and explained

that the likely market responses to the action and No Action alternatives varied

significantly, resulting in different impacts to the climate that must be disclosed

under NEPA.  App. 725-26.

   BLM erroneously claims that Conservation Organizations asserted that the

agency "was required to use" a "particular model."  BLM Br. at 33.  Not so.

Rather, the Organizations noted that, "[t]here are multiple energy-economy models

that could reasonably inform BLM's analysis of the likely changes to the coal

market – and indeed have been used by other agencies to study similar issues in the

past."  Op. Br. at 32.  *See id*. at 34 ("BLM should have used NEMS or another

available energy model.").  This position is entirely consistent with Conservation

Organizations' presentation of this issue to the District Court.  *See* App. 113 ("In

looking at economic market reactions to such supply and demand issues, agencies

may not simply ignore effects based on economic principles."); App. 382 n.7

("Other computer models also exist that may be even more suited to the task at

hand.").

Conservation Organizations address available models not to suggest that

BLM must use one particular model over another, but to highlight the arbitrary and

capricious nature of BLM's failure to use any model at all.  While BLM claims

repeatedly that its decision was based on "then-available information," BLM Br. at

1; *see also* 14, 16, 19, 22-27, 30, in fact the agency ignored models that were

available at the time.  In 2010, when BLM issued its Wright Area EIS, there were

at least two energy models that were "then-available" and had been used for years

by other federal agencies to analyze the energy market responses to agency

proposals.  EIA created the NEMS model in 1994, and the Surface Transportation

Board used it in 2006 to study the market's response to a proposed rail line to

transport coal from mines in Montana and Wyoming.  Op. Br. at 33-34.  Similarly,

ICF International's Integrated Planning Model has been used by EPA to evaluate

energy market responses to specific proposals since at least 2004,[6] and was used

recently by the U.S. Forest Service to predict market and climate impacts from its

proposal to allow coal mining on otherwise protected public lands in Colorado.

*See* Op. Br. at 35 n.9.

Although BLM suggests a market analysis would have led the agency "upon

an exploration of unchartered territory" "at the frontiers of science," BLM Br. at

31, 34, the agency offers no reasoned explanation for why it refused to employ the

EIA model or models that other federal agencies have used for years to assess the

market effects of their decisions.  While courts often defer to an agency's choice of

methodology to study a particular issue, BLM employed *no* method at all, and thus

no deference is warranted.  *See Oregon Nat. Desert Ass'n v. B.L.M.*, 625 F.3d

1092, 1121 (9th Cir. 2008) ("Here the BLM used *no* method to analyze or plan for

the management of such values.  We cannot defer to a void.").

Understanding the market and climate impacts of a decision to approve or

reject what are among the largest coal leases in history is essential to making an

informed decision.  BLM violated NEPA by failing to either use available tools to

provide that essential information or explain why it could not do so.  Under the

applicable regulations, the agency "shall" explain in its EIS (1) why such essential

---

[6] *See* EPA, https://www.epa.gov/airmarkets/ipm-analysis-clean-air-interstate-rule-cair#Final
(documenting EPA's use of the "IPM" in 2004 to evaluate the Clean Air Interstate Rule).  The
Court may take judicial notice of information on agency websites under Federal Rule of
Evidence Rule 201.

information is incomplete or unavailable; (2) its relevance to reasonably foreseeable impacts; (3) a summary of existing science on the topic; and (4) the agency's evaluation based on any generally accepted theoretical approaches. 40 C.F.R. § 1502.22(b). BLM has not asserted that it was unaware of these models, nor has it argued these models would not be informative or were too expensive to use. Finally, BLM's suggestion that if it had undertaken such an analysis, it might not have revealed that the leasing has any consequential effect, BLM Br. at 30, amounts to nothing more than post-hoc rationalization by BLM's counsel. "An agency cannot . . . avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Steamboaters v. F.E.R.C.*, 759 F.2d 1382, 1393 (9th Cir. 1985) (citation omitted).

II.  **BLM's Arbitrary Conclusion that Its Decision to Authorize the Wright Area Leases Would Have No Effect on the Climate Is Not Harmless Error.**

BLM argues, for the first time, that even if it violated NEPA in failing to adequately disclose the climate impacts of approving the Wright Area leases, this error was "harmless." BLM Br. at 38-40. BLM's new defense fails for several reasons.

First, BLM did not present this "harmless error" argument before the District Court, and thus it waived the argument. *See Hicks v. Gates Rubber Co.*, 928 F.2d

19

966, 970 (10th Cir. 1991) (noting "the general rule that an appellate court will not consider an issued raised for the first time on appeal"). *Accord* Wyo. Br. at 28 (quoting same).

Second, the error was not harmless because BLM's failure to adequately disclose the climate impacts of the four Wright Area leases eviscerates "the heart" of NEPA's procedural mandate by inaccurately skewing the consideration of alternatives. *See* 40 C.F.R. § 1502.14. NEPA regulations limit application of the harmless error doctrine to "trivial violations of these regulations." 40 C.F.R. § 1500.3. "The role of harmless error in the context of agency review is constrained" and it "may be employed only when a mistake of the administrative body is one that *clearly had no bearing* on the procedure used or . . . decision reached." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 787 (10th Cir. 2006) (citations and quotations omitted). By arbitrarily asserting that the climate effects of authorizing two billion-ton coal leases are essentially no different from leaving that coal in the ground (the No Action alternative), BLM misled the public and decisionmakers on the key aspect of the environmental analysis. "[W]e will not uphold the agency's decision on the grounds that it *might* have made the same decision even without the error; otherwise, NEPA would be a near-toothless environmental safeguard." *Prairie Band Pottawatomie Nation v. Fed. Highway*

*Admin.*, 684 F.3d 1002, 1010 (10th Cir. 2012) (quoting *Catron Cty. Bd. Of*

*Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996)).

BLM has not met its burden of showing that an accurate disclosure of

climate effects would have no bearing on its decision. BLM erroneously implies

that the burden of proof rests with Conservation Organizations, BLM Br. at 38, but

the burden is on BLM to demonstrate any error was harmless. *See N.R.D.C.*, 421

F.3d at 808, 816 ("The Forest Service bears the burden of demonstrating

harmlessness" and the agency's "error in assessing market demand fatally infected

its balance of economic and environmental considerations."). BLM's reliance on

*Prairie Band Pottawatomie Nation*, BLM Br. at 39, is misplaced; there, this Court

concluded that "we know for a certainty that additional noise analysis could not

have altered the outcome." *Prairie Band Pottawatomie Nation*, 684 F.3d at 1010.

Here BLM has made no such showing—nor could it. Prior to BLM's decisions

authorizing the Wright Area leases, both President Obama and then-Interior

Secretary Ken Salazar directed federal agencies to take steps to reduce greenhouse

gas emissions. App. 33 (Complaint para. 52) ("The realities of climate change

*require us to change how we manage* the land," calling for "a unified greenhouse

gas reduction program" by Interior Department agencies) (emphasis added); App.

33 (Complaint para. 53) (instructing federal agencies to "measure, report, and

*reduce* their greenhouse gas emissions from direct and indirect activities.")

21

(emphasis added).  Moreover, the EIS itself acknowledged that climate change "should be addressed in governmental decision making."  BLM Supp. App. 2. Given this clear instruction and the massive scale of the Wright Area leases, BLM cannot credibly claim that an accurate understanding of climate effects would categorically not influence its decision.  As such, BLM's error here was hardly "trivial," and thus not harmless.  40 C.F.R. § 1500.3.

### III.     Conservation Organizations Meet Article III Standing Requirements.

Industry Intervenors (BTU Western Resources, National Mining Association, Wyoming Mining Association) alone challenge Conservation Organizations' standing.  Relying on U.S. Supreme Court precedent, the D.C. Circuit Court and multiple federal district courts have all affirmed that Conservation Organizations can demonstrate standing to challenge BLM's consideration of climate impacts under NEPA based solely on concrete, non-climate injuries caused by BLM's approval of coal mine expansions onto public lands.  As the District Court here aptly explained, "[t]he viewpoint that the associations must allege a personal injury resulting from climate change, rather than the lease expansion authorizations, is not supported by law or persuasive authority."  App. 440.

**A. Conservation Organizations Have Established Article III Standing by Demonstrating Injury, Causation, and Redressability.**

The D.C. Circuit Court, D.C. District Court, District of Colorado and District of Wyoming have all held Conservation Organizations can base standing to raise climate arguments under NEPA solely on the type of local, non-climate harms alleged here.  App. 202-230 (Declaration of Jeremy Nichols); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306-07 (D.C. Cir. 2013); *High Country*, 52 F.Supp. 3d at 1186-87; *WildEarth Guardians v. B.L.M.*, 8 F.Supp.3d 17, 30 (D.D.C. 2014); *WildEarth Guardians v. U.S. Forest Serv.*, 828 F.Supp.2d 1223, 1235 (D.Colo. 2011).  Because the injury in NEPA cases is caused by an agency's *uninformed* decision, *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996), a judicial order requiring the agency to comply with NEPA's procedural mandates ensures that the agency's decision is fully informed, redressing a plaintiff's injury.  *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265-66 (10th Cir. 2002).  NEPA plaintiffs do not need to show that an agency would alter its ultimate decision once it adequately considers a project's impacts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

Conservation Organizations' theory of standing builds on Supreme Court precedent that explicitly rejected the notion that the injury relied upon to establish standing must be substantively connected to the merits of a plaintiff's claim.  *Duke Power Co. v. Carolina Envtl. Study Grp. Inc.*, 438 U.S. 59, 79 (1978).  In *Duke*

23

*Power* plaintiffs challenged the constitutionality of a federal law that would have facilitated the construction of a nuclear power plant near their homes, alleging environmental and aesthetic harms. *Id.* at 67. The Court explicitly rejected the defendant's argument that "[s]ince the environmental and health injuries claimed by appellees are not directly related to the constitutional attack . . . such injuries . . . cannot supply a predicate for standing" to raise the constitutional claims. *Id.* at 78. The Court concluded that it "cannot accept the contention that . . . a litigant must demonstrate something more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." *Id.* at 79.

The D.C. Circuit Court, in a case closely analogous to the one here involving an expansion of a coal mine onto public lands, expressly rejected the notion that "the specific type of pollution causing the Appellants' aesthetic injury—here, local pollution—be the same type that was inadequately considered in the FEIS." *Jewell*, 738 F.3d at 307 (citing *Duke* Power, 438 U.S. at 78-79). The D.C. Circuit explained why its decision is consistent with the Supreme Court's holdings in *Duke Power*, 438 U.S. at 78 (injury relied on to establish standing need not dovetail with the substantive merits argument), *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (standing required for each form of relief sought), and *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009) (procedural error must

24

harm any of plaintiff's concrete interests). *Jewell*, 738 F.3d at 305-07, 308 n.3.

The court concluded that petitioners established standing under circumstances

nearly identical to those here:

> The Appellants' aesthetic injury follows from an inadequate FEIS
> *whether or not the inadequacy concerns the same environmental issue*
> *that causes their injury*. If we vacate the BLM order, their injury will
> be redressed regardless whether the FEIS's specific flaw relates to
> local or global environmental impacts; either way, the remedy is
> "limited to the inadequacy"—here, a deficient FEIS—"that produced
> the injury in fact that the plaintiff has established."

*Id.* at 307 (quoting *Daimler Chrysler*, 547 U.S. at 353) (emphasis added).

Here, Industry Intervenors' identical argument—that Conservation

Organizations lack standing to raise climate arguments under NEPA because they

do not assert a specific harm from climate impacts rather than from the project

itself—also "slice[s] the salami too thin." *Jewell*, 738 F.3d at 307.

## B. Conservation Organizations Presented the Same Standing Theory in District Court.

Contrary to Industry Intervenors' protests, Conservation Organizations do

not present this Court with a new theory of standing on appeal.[7] Conservation

Organizations base their standing on harm to their members' non-climate,

recreational and aesthetic interests caused by the expansion of coal mines onto

public lands used by Conservation Organizations' members. Op. Br. at 18-19;

---

[7] Before the district court, Conservation Organizations presented an alternative theory of standing based on climate harms to their members' interests. App. 78-91. The District Court did not address the theory, and this Court need not reach it either.

App. 202-230 (Nichols Declaration). Conservation Organizations relied on those same non-climate injuries in district Court. *See* App. 78 (Dist. Ct. Op. Br.) ("the approved action will cause local air pollution that injures Petitioners' members . . . an order compelling BLM to reconsider its analysis—for any reason—may lead BLM to deny or modify the Leases and avoid injuring Petitioners."); App. 359 (Dist. Ct. Reply Br.) (asserting standing to challenge climate analysis "based solely on their members' aesthetic and recreational injuries caused by the leases' air pollution") (citing *Jewell*, 738 F.3d at 308); App. 410-11 (Notice of Supp. Auth.) (same). Because this identical theory of standing was presented to the District Court, it was not waived.

Although Industry Intervenors insist that Conservation Organizations' non-climate injuries somehow "drop out" before this Court because they are not appealing BLM's evaluation of non-climate pollutants, Def.-Int. Br. at 10, Intervenors misconstrue the basis for standing and cite no authority for their novel theory. As explained here and in District Court, Conservation Organizations' members would suffer a concrete injury stemming from BLM's inadequate NEPA review that would be redressed by a favorable decision on the merits. Op. Br. 17-19; App. 202-30 (Nichols Declaration), 73-78 (Dist. Ct. Op. Br.), 359-60 (Dist. Ct. Reply Br.), 409-11 (Notice of Supp. Auth.). If BLM's decisions are set aside – on any basis – the injuries those members would suffer from viewing the machinery,

dust clouds, and orange plumes of nitrogen oxides would be prevented, at least until BLM makes a new decision based on adequate NEPA review.  Nothing more is required and this Court should reject Industry Intervenors' attempt to raise the bar for Article III standing beyond injury, causation, and redressability.

### IV.    The Appropriate Remedy Is Vacatur of the Leases and Injunctive Relief.

BLM argues that if this Court finds that the NEPA violations extend beyond harmless error, the proper remedy is to reverse and remand the matter to the district court without vacating BLM's Records of Decision, EIS, and lease authorizations. BLM Br. at 40 n.6.  BLM further asserts that "Plaintiffs have not asked for, and this Court should not grant, either vacatur of the leases or injunctive relief."  *Id.* BLM is wrong on both counts.

Conservation Organizations have consistently asked both this Court and the District Court to vacate BLM's authorization, sale, and issuance of the four leases at issue here, including each individual Record of Decision and the Wright Area EIS.  *See* App. 49 (Complaint) (asking the District Court to "vacate said FEIS and RODs as invalid, and vacate any lease sales, issuances, or other actions" and "Enjoin any further BLM approvals . . . and any coal mining activities" on the leases until BLM has complied with NEPA); App. 119 (Dist. Ct. Op. Br.) (asking the District Court to "vacate BLM's authorization, sale, and issuance" of the

27

leases); App. 385 (Dist. Ct. Reply Br.) (same); Op. Br. at 39 (requesting this Court "vacate" "BLM's authorization, sale, and issuance of the North Hilight, South Hilight, North Porcupine, and South Porcupine leases, including the Wright Area Final EIS and individual Records of Decision challenged here.").

"Vacatur is the normal remedy for an agency action that fails to comply with NEPA." *High Country Conservation Advocs. v. U.S. Forest Serv.*, 67 F.Supp.3d 1262, 1263 (D. Colo. 2014). Under the Administrative Procedure Act courts "shall" "hold unlawful and set aside agency action" that is found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A). Although courts retain equitable discretion in setting the remedy, here vacatur is the only remedy that serves NEPA's fundamental purpose of requiring agencies to look *before* they leap and the only one that avoids a "bureaucratic steam roller." *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002) (citation omitted). NEPA regulations instruct that the NEPA process must "not be used to rationalize or justify decisions already made." 40 C.F.R. § 1502.5. As the Colorado District Court explained in a closely analogous case, vacatur was appropriate because the agency's decision on remand was not a "foregone conclusion . . . . NEPA's goals of deliberative, non-arbitrary decision-making would seem best served by the agencies approaching these actions with a clean slate." *High Country*, 67 F.Supp.3d at 1265. The same is true here.

## CONCLUSION

Accordingly, Conservation Organizations request this Court vacate BLM's Wright Area EIS, Records of Decision, and any sale of the challenged lease authorizations.

Respectfully submitted on this 25th day of April, 2016.

s/Nathaniel Shoaff
Nathaniel Shoaff
California Bar No. 256641
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5610
nathaniel.shoaff@sierraclub.org

s/Nathan Matthews
Nathan Matthews
California Bar No. 264248
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5695
nathan.matthews@sierraclub.org

s/Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
New Mexico Bar No. 23276
516 Alto Street
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1) This brief complies with the type-volume limitation of Fed. R. App. P.

   32(a)(7)(B) because this brief contains 6,995 words, excluding the parts of

   the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2) This brief complies with the typeface requirements of Fed. R. App. P.

   32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

   this brief has been prepared in a proportionally spaced typeface using

   Microsoft Word, Version 14.0.7166.5000 (2010), in size 14 Times New

   Roman.


Date: April 25, 2016

                                        s/Nathaniel Shoaff
                                        Nathaniel Shoaff
                                        Attorney for Petitioners-Appellants
                                        Sierra Club
                                        85 Second Street, Second Floor
                                        San Francisco, CA 94105
                                        (415) 977-5610
                                        nathaniel.shoaff@sierraclub.org

## CERTIFICATE OF SERVICE

I, Nathaniel Shoaff, hereby certify that on April 25, 2016, a true and correct copy of the PETITIONERS-APPELLANTS' REPLY BRIEF was served on the following counsel of record through the Court's ECF system:

Beau Bryan Bump
Holland & Hart LLP
2515 Warren Avenue, Suite 450
P.O. Box 1347
Cheyenne, WY 82003-1347
bbbump@hollandhart.com

Sherrie Alice Armstrong
Kirsten Nathanson
Daniel W. Wolff
Crowell & Moring
1001 Pennsylvania Ave., NW
Suite 1100
Washington, DC 20004
sarmstrong@crowell.com
knathanson@crowell.com
dwolff@crowell.com

Andrew C. Emrich
Holland & Hart LLP
6380 South Fiddlers Green Circle
Suite 500
Greenwood Village, CO 80111
acemrich@hollandhart.com

Michael R. Drysdale
Dorsey & Whitney
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402-1498
drysdale.michael@dorsey.com

James Kaste
Michael McGrady
Erik Petersen
Office of the Attorney General
for the State of Wyoming
2320 Capitol Avenue
Cheyenne, WY 82002
james.kaste@wyo.gov
mike.mcgrady@wyo.gov
erik.petersen@wyo.gov

Michael Thomas Gray
US Department of Justice
c/o US Army Corps of Engineers,
Office of Counsel
701 San Marco Boulevard
Jacksonville, FL 32207
michael.gray2@usdoj.gov

John Most
United States Department of Justice
Environment & Natural Resources
Division
P.O. Box 663
Washington, DC 20044-0663
john.most@usdoj.gov

Kristina R. Van Bockern
Holland & Hart
555 17th Street, Suite 3200
Denver, CO 80202
trvanbockern@hollandhart.com


Date: April 25, 2016


s/Nathaniel Shoaff
Nathaniel Shoaff
Attorney for Petitioners-Appellants
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5610
nathaniel.shoaff@sierraclub.org

## CERTIFICATE OF DIGITAL SUBMISSION

I, Nathaniel Shoaff, hereby certify that with respect to the foregoing:

1) all required privacy redactions have been made pursuant to 10th Cir. R. 25.5;

2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3) the ECF submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (Symantec Endpoint Protection, version 12.1.5337.5000, updated April 25, 2016), and, according to the program, are free of viruses.

<u>s/Nathaniel Shoaff</u>
Nathaniel Shoaff
Attorney for Petitioners-Appellants
Sierra Club
85 Second Street, Second Floor
San Francisco, CA 94105
(415) 977-5610
nathaniel.shoaff@sierraclub.org